CARRIE PANNELL, *Widow, etc. v.* STATE COMPENSATION COMMISSIONER *et al.*

(No. 9583)

Submitted April 4, 1944. Decided April 25, 1944.

*Patrick J. Flanagan,* for appellant.
*J. Randolph Tucker,* for appellees.

FOX, JUDGE:

The claimant has appealed from an order of the Compensation Appeal Board, denying her compensation as the widow of R. P. Pannell, an employee of the Vera Pocahontas Coal Company, who died on the 19th day of January, 1942, from cerebral hemorrhage. The attack from which he died came while he was in the course of his employment as a coal miner; and it is contended by the claimant that the attack resulted from said employment because of the presence of carbon dioxide, commonly called "black damp" in his working place in the mine. Specifically, her claim is that her husband had high blood pressure, and the presence of this poisonous gas operated to raise that pressure to the extent that it caused a breaking down of a blood vessel in the brain, which resulted in his death. There is no dispute as to the direct cause of his death. All the medical testimony is that he suffered what is termed a massive cerebral hemorrhage, which means that there was a rupture of a blood vessel and a diffusion of blood throughout the brain cavities. The employer ques-

tions the claim that decedent had high blood pressure, but in our view of the case it is of little importance whether he did or did not suffer from this ailment.

The decedent was working in what may be termed a dead end working place in a mine operated by his employer, and at a point near an abandoned portion of a mine which had been operated by another coal company. Air was forced into the mine through an air course which passed near, but not through the working place in which decedent was working. The air was diverted from its main course through another channel in which was constructed a curtain or brattice work for the purpose of checking the air in that course, and thereby forcing it back into the working place of the decedent. It is clearly shown that there was supposed to be danger of bad air in this dead end working place, and the mine foreman was cautioned to be on guard against this condition. This mine foreman, Snyder, testified that he examined the working place in question during the morning of January 19, and found no gas. Two other miners who worked some little distance from the point at which decedent worked, testify that there was some gas in their working place, but apparently not in dangerous quantities. Decedent's working place was inspected by the mine foreman the day following decedent's attack, and no gas was found, and on the day following the same working place was examined by an inspector of the State Mine Department, who found the air in a healthy condition. While there is some evidence indicating the existence of gas in the working place of the decedent, prior to the break-through into the abandoned mine hereafter to be discussed, we do not think such evidence is sufficient to establish that gas in dangerous quantities existed at that time. The evidence is that the decedent and his stepson, who was working with him, had suffered no apparent ill effects up to the time of the break-through into the abandoned mine. They went to work at the regular time, and worked two or three hours until about the

middle of the day when the decedent's attack came. The fact that, up to this time, they had suffered no ill effects from their work argues that, prior to the break-through into the abandoned mine, there was probably no gas in harmful quantities in their working place in the mine.

The decedent and Harold Spencer were working together in this mine. They were only a few feet apart. Decedent in working at the face of the coal broke through into the abandoned mine. He called Spencer's attention to the fact that he had made a break-through, and Spencer says that he had thrown two or three shovelfuls of coal when he noticed that decedent was running away from his working place, and then immediately fell to the floor of the mine. Spencer went to him, found him apparently unconscious, dragged him a short distance in the direction of the working place entry, and called for help. We may assume that when the break-through occurred, air was released from the abandoned mine and came into decedent's working place. Snyder, testifying as to this opening, says that when he examined it he felt the velocity of the air; so we think it cannot be questioned that the break-through caused a release of air from the abandoned mine into decedent's working place. We do not know what the character of this air was. We can only reason from cause to effect. The break-through came, the air was released, and immediately decedent suffered his attack. The physicians who testified say that the effect of contact with carbon dioxide is to raise blood pressure, and it is, of course, obvious that the raising of blood pressure at least contributes to the bursting of a blood vessel whether it be weak or strong.

Under our decisions, we are required to deal with this matter in a spirit of liberality toward the claimant, and applying this principle, we find difficulty in escaping the conclusions that this decedent's attack came as the result of the break-through into the abandoned mine, and the rush of air from that mine into his working place. It is true that we do not know what kind of air came from

the abandoned mine, but, in all probability, is was poisoned air, because that event was immediately followed by the decedent's collapse and his subsequent death. The commissioner and appeal board do not appear to have given due weight to this feature of the case. In our opinion, they should have held the decedent's death compensable, and their holding should have been based upon the isolated, specific and fortuitous event of the break-through, and the release of gas as indicated above. The principles announced by this Court in *Collett* v. *Compensation Commissioner*, 116 W. Va. 213, 179 S. E. 657; *Rasmus* v. *Compensation Commissioner*, 117 W. Va. 55, 184 S. E. 250; *Gilbert* v. *Compensation Commissioner*, 121 W. Va. 10, 18 S. E. 2d 167; and *Keller* v. *Compensation Commissioner*, 125 W. Va. 185, 24 S. E. 2d 81, would have justified such holding.

The medical testimony is of little value. One physician testified that, in his opinion, the hemorrhage was caused by contact with poisonous gas; one that he does not think the hemorrhage was the result of poisonous gas; and two others that they saw no sign of gas poisoning. There is testimony that gas poisoning usually results in diversified hemorrhage and not a rupture, such as we have in the case at bar; but there is no contention here that there was gas suffocation.

The examination of the mine before and after decedent's attack does not help us. As indicated above, the examination made by Snyder in the morning of January 19 disclosed no gas. He found no gas when he examined the mine after the accident; and the state inspector found none. There is dispute as to whether the curtain or brattice was out of repair, and was afterwards repaired. Whatever the fact may be on this point, there was ample time for the gaseous condition, if any, to clear up after the decedent's attack and before an examination was made. The application of oxygen air to this working place, which created the condition testified to by Snyder and the mine inspector, would have taken care of the gas from the abandoned mine. We may, therefore, act upon

the probability that the gas from the abandoned mine caused decedent's death, and at the same time accept in full the statements of Snyder and the mine inspector as to conditions when they examined the mine subsequent to decedent's attack.

It must be kept in mind that it is not contended that Pannell died from suffocation which results from gas poisoning. There would, therefore, be nothing to indicate gas poisoning. What is claimed is that the bad air in the mine raised the blood pressure and caused the brain artery to break down. No one knows what caused this break-down. It might have occurred had the air been entirely safe. But in this world there are many things about which we cannot be certain. We are often called upon to determine matters where there is no satisfactory proof on which to base a decision, and yet a decision must be made. In such circumstances, we are driven to rely upon presumptions and probabilities. This is not uncommon in civil cases of all types, and there is no reason why it should not be followed in compensation cases. Indeed, there are special reasons why the principle should be applied in such cases, over those which justify its use in ordinary civil litigation. There is, of course, no presumption in the case before us; but there are facts from which we can say that, in all probability a particular result followed. Here Pannell, the decedent, had been working for some hours with no apparent bad results. This would indicate that the air in his working place was safe. Then something happened: the break-through into the old mine, which we may assume caused a release of air. When Pannell came in contact with it, he immediately collapsed. Viewing the matter from the standpoint of reason and probability, can we come to any conclusion other than that the air released from the old mine caused the collapse? Are we to disregard this hypothesis merely because it may be said that the collapse might have occurred had their been no break-through? We think not. We think the commissioner and the board overlooked this

feature of the case, and that they were plainly wrong in failing to appraise the case from the established facts which, in our opinion required a holding that decedent's death resulted from an attack suffered in the course of and resulting from his employment.

We are confronted with the holdings of the commissioner and board adverse to the claimant, and it is contended that in view of the conflict in the evidence such ruling should not be disturbed. That this Court will not set aside the ruling of the board on a question of fact, unless the same is believed to be clearly wrong, is well settled law and we approve and adhere thereto; but where we think a ruling is plainly wrong, we do not hesitate to set it aside. On the other hand, the rule that in compensation cases application for compensation shall be viewed most liberally in favor of workers and their dependents, is likewise well established.

While we do not hold that evidence produced by a claimant for compensation is entitled to more weight, or to be appraised by a different rule than that offered in resistance to the claim, we recognize the law to be that, in such cases, facts are permitted to be established by informal methods, decisions made therefrom, and probabilities weighed in a manner which would not be permitted in the trial of an action at law, governed by the more or less rigid rules of evidence applicable to such cases. This being true, we think the facts of this case call for a holding in favor of the claimant, based solely upon the ground that the decedent's attack in the mine resulted from poisonous air which came into decedent's working place in the mine at the time of the break-through from the abandoned mine occurred.

We therefore reverse the order of the Compensation Appeal Board, and remand the case to the Compensation Commissioner, with instructions to award compensation to the claimant.

*Reversed and remanded.*