LILLIAN WILLIAMS, *Widow, etc. v.* STATE COMPENSATION COMMISSIONER *et al.*

(No. 9600)

Submitted September 7, 1944. Decided October 3, 1944.

*Brown, Jackson & Knight* and *W. T. O'Farrell*, for appellants.

*J. V. Gibson* and *Cramer W. Gibson*, for appellee.

Fox, Judge:

Claimant is the widow of Gilbert E. Williams, who died suddenly on September 15, 1942, while in the employ of the Charles H. Tompkins Company and Mauran-Russell-Crowell & Mullgardt, at the Allegheny Ordnance Plant, in Mineral County, West Virginia, and within six or eight miles of the City of Cumberland, Maryland. Claim is filed not only on behalf of the widow, but in behalf of a child under the age of sixteen years. By an order entered on April 23, 1943, the claim was rejected on the ground that the death of the deceased was not due to an injury received in the course of and resulting from his

employment. Timely protest was made and a hearing granted. Evidence was taken on the case at various points in the State, and on November 12, 1943, the Commissioner set aside his former order, awarded compensation to the widow, and held the case open for the birth certificate of the child, which was afterwards furnished. The employer appealed the case to the Compensation Appeal Board, and, on February 5, 1944, that board affirmed the order of the Compensation Commissioner, from which order we granted this appeal on March 13, 1944.

Immediately preceding his death, claimant's decedent, along with a man by the name of Moyers, was working on a scaffold on the side of a building, nailing tar paper to the underneath portion of the drip of the roof. The testimony is somewhat confusing on this point, but it seems rather clear that when standing erect on the scaffold, the upper portions of the men's bodies extended above the eave of the building, and apparently the sun's rays were reflected from the roof. The deceased had complained that morning of not feeling well, and of suffering from heartburn, and probably did not eat lunch that day. Sometime in the afternoon, probably about three-thirty o'clock, while the deceased and Moyers were engaged in their work, the deceased remarked that he could not see anything to nail to and within a minute said, "I am done for", and fell to the scaffold striking his head and face on some part of the scaffold. Moyers caught him by the feet in order to prevent his falling from the scaffold. Blood gushed from his nostrils which may have been occasioned by the fall, and the bridge of his nose was broken. He was taken from the scaffold and died shortly thereafter without regaining consciousness, and his body was then taken to a funeral home in that vicinity, where it was examined about an hour later by Dr. Wilson. Before this, however, he was taken to the relief station on the plant, where it seems that a Dr. Gray there examined him, or had a view of the body. A death certificate, filed

in the office of the Clerk of the County Court of Mineral County, is introduced in the record, in which the cause of death is stated to be "chronic obstruction nephritis". No one sponsors this statement. There is considerable evidence in the case tending to dispel the idea that he died from chronic obstruction nephritis, or any kidney ailment, and we think it quite clear that he did not die from such ailment, and that the cause of his death was either heat prostration, or some character of heart trouble.

It may be the parties to this controversy overstress the importance of whether claimant's decedent died from a heart attack or heat prostration. The claim is prosecuted on the theory that it is necessary to show heat prostration as the cause of death. We understand that heat prostration would naturally affect the heart; and if the circumstances were such that it could be said that the situation in which the deceased was working was different from that to which the general public, as we interpret that phrase, was subjected, and there was some specific and particular event which caused either a heart attack or heat prostration, whatever the technical difference between the two may be, and death or injury resulted therefrom, the case might be one in which compensation should be awarded. The parties here attempt to show, one that decedent died of a heart attack, and the other that he died of heat prostration; and so we consider it proper to discuss the statements of the physicians on those contentions.

As stated above, Dr. Wilson examined the body of the decedent about an hour after his death. On September 16, 1942, he wrote the Hartford Accident & Indemnity Company a letter in which he stated that he had examined the body of the deceased. He describes what he found, referring to blood streaks on both cheeks, which he says had come from his nostrils. He stated that there was a small contusion of the lobe of his right ear, and another just below the right eye, and still another at the right

side of the bridge of his nose, and a laceration about a half inch across the bridge of his nose, with the nasal bones fractured at their juncture with the nasal cartilage, and that there were no other marks of importance on the body. He then states, "It is my opinion that this man unquestionably died of a condition that was in no way related to his work, and in no way attributable to an accident. The most probable cause of his death was cardiac disease." It is assumed that this letter was written for its bearing on possible insurance liability for accidental death. Later in the hearing of the case the testimony of Dr. Wilson was taken, and reference is made therein to the letter to the Indemnity Company, from which we have quoted. In this testimony he again states that he examined the body of the deceased; and in answer to a hypothetical question, which included a statement that deceased preceding his death had stated to the man working with him, "I can't find anything to nail to", and about a minute later said, "I am done for" and then fell to the scaffold, and that when he fell there was a slight flow of blood from his mouth. He was then asked what would be indicated from a man dying under such circumstances, to which he answered, "A presumptive evidence of heart condition." On cross-examination he said he had made no post-mortem examination, and arrived at his conclusion from his observations and what he was told. He also said, in effect, that while blood flowing from the mouth and nostrils could come from a blow on the back of the head, this would not happen unless the man had very high blood pressure, and there would be a bursting of blood vessels in the nostrils. In answer to another hypothetical question, which assumed that the day on which deceased died was a hot day, hotter than that ordinarily occurring in that territory, and assuming that the man had never suffered any heart condition prior to that time, or any illness on or about that time, and was working on a scaffold which was only two or three feet below the roof of the building, and subjec-

ted to the direct heat rays of the sun, together with the reflected rays which reached more than half his body, and particularly the upper part of the body, would it have been possible for this man to suffer heat prostration at that time, he replied, "Yes, sir." To another question if under these conditions he could not easily have suffered heat prostration, he answered, "Provided he didn't have something like a heart or circulatory condition." This was followed by the further statement that under these conditions "If the man had no heart trouble, the assumption would be heat or exhaustion which produced his death." He stated that he was not altogether positive that the man died of a cardiac affliction; and when his attention was directed to the fact that it appeared from other evidence that on the morning of his death decedent was suffering from indigestion, and that his foreman suggested that he go home, and gave him some bicarbonate of soda, stated that such condition is frequently associated with heart condition, but that it could have been caused by a stomach condition. Further, that as a rule a cardiac condition is not something that comes on suddenly, but that something precedes it.

The only other testimony pertaining to the cause of death was that of Dr. Whittlesey, who never examined the deceased or his body. Dr. Whittlesey, in answer to a hypothetical question undertaking to set out the facts surrounding the death of the deceased, was first asked if death had resulted from a kidney condition, to which he answered in the negative. He was then asked whether under the circumstances he had died from a cardiac disturbance, to which he replied, "Possibly he did. It is well known to everybody, not doctors only, that sudden death may occur from heart disease. This man, however, had no preceding symptoms suggestive thereof, and not many months previous had been in one of the veterans hospitals where, without a doubt, in accordance with their custom, complete examination was made, including the heart, and had any disturbance of the sort been found,

it would have been noted in their final report." He was then asked from the history of the case, and from his experience as a physician and surgeon specializing in internal medicine, what he would say, and what his opinion would be, as to whether deceased died from heat prostration, to which he replied: "It seems most probable to me that this heat prostration or effects of heat were the prime cause of his death. It seems quite definite that the weather was hot, and we know the man was working in very hot surroundings. We know furthermore that his general condition up until that time had been quite good. The harmful effects of heat range all the way from mild to extremely and sudden, almost instantaneous death, and considering the whole case, it seems to me that that offers the most reasonable explanation for his quite sudden death." He was then asked, "Doctor, that is your opinion", to which he answered, "Yes, sir." On cross-examination he admitted, in effect, that the presence of heartburn or indigestion frequently accompanied heart trouble, but that the commonest cause of heartburn is a stomach disturbance; and in answer to a question by the trial examiner, which referred to conditions existing at the time of death: "Then it is possible that this man may have died from heat prostration, rather than neuphritis or some other cardiac ailment", replied, "Yes, sir."

So it is that we have the testimony of two reputable physicians, one of whom thinks that death resulted from a heart attack, but admits that it may have resulted from heat prostration. The other says he probably died of heat prostration, and thinks this is the most reasonable explanation of his death; but, at the same time, admits that he may have died from a heart attack. The evidence on this point is unsatisfactory, and it is doubtful whether the same is sufficient to establish the contention of the claimant that death resulted from heat prostration. If a showing of that fact is necessary to sustain the asserted claim, then something necessary to an award of compen-

sation is lacking, because, while informality in the presentation of evidence is permitted in compensation cases, and, under many decisions of this Court, a rule of liberality in favor of the claimant will be invoked in appraising the evidence presented, still the burden of establishing a claim rests upon the one who asserts it, and no rule of liberality will take the place of required proof. We are, therefore, of the opinion that it has not been clearly established that the deceased died of heat prostration. The rule invoked in *Pannell* v. *Compensation Commissioner*, 126 W. Va. 725, 30 S. E. 2d 129, is based upon a situation where there was a high degree of probability that death had resulted from a particular cause. Here we cannot say that there is greater probability that he died from heat prostration than that he died from a heart attack. In this connection, it seems proper to advert to the objection made by the employers to the form of the hypothetical questions propounded to Dr. Whittlesey. The rule is that "A hypothetical question which assumes facts unsupported by the evidence should not be submitted to an expert witness." *Blair* v. *Clark Coal & Coke Co.*, 107 W. Va. 507, 148 S. E. 849. Considering all of the facts in this case, we do not think this hypothetical question conformed in all respects to this rule; but in our view of the weight which should be given to the testimony of Dr. Whittlesey, the failure to conform to the rule stated above is not clearly prejudicial to the employers in this case.

We, therefore, reach the important question here involved; that is whether claimant's decedent died in the course of and resulting from his employment. Obviously, he died in the course of his employment, but did his death result therefrom? The question is a difficult one and has been maturely considered by this Court, from the viewpoint of heat prostration, in three cases. In *Collett* v. *Compensation Commissioner*, 116 W. Va. 213, 179 S. E. 657, it was held "Heat exhaustion attributable to a specific event is compensable under our Workmen's Com-

pensation Act, if shown to have resulted from special or particular risks or dangers attendant to the employment, to which the general public is not exposed." We think it would be true that a heart attack attributed to a specific event of the nature mentioned in the above quotation would likewise be compensable. We so held in *Gilbert* v. *Compensation Commissioner*, 121 W. Va. 10, 1 S. E. 2d 167. The statement of the law quoted above was followed in the subsequent cases of *Rasmus* v. *Workman's Compensation Appeal Board*, 117 W. Va. 55, 184 S. E. 250, and *Keller* v. *State Compensation Commissioner*, 125 W. Va. 185, 24 S. E. 2d 81. In the *Collett* case claimant's decedent was working as a roller in a tin mill, and in the course of his work was required to lift forty-pound packs of metal in white heat condition from the floor onto the roller, at a time when the outside temperature was around eighty-one degrees. Two physicians stated that the cause of his death was heat exhaustion, although other names were used in describing the finding of the autopsy, and in diagnosing the case by the physician who was called, and who signed the death certificate. Compensation was allowed in that case on the theory that decedent was subjected to a condition different from that to which other persons in the community were subjected, which, obviously, was caused by artificial as distinguished from natural heat.

In the *Rasmus* case substantially the same conditions existed, except that decedent in that case was operating a crane and suffered a heat stroke, and the testimony was that the temperature in the cab of the crane was cooler than on the ground around it. A divided Court awarded compensation on the ground noted in the majority opinion that "a man with metal underneath him, metal above his head, metal in part surrounding him and large quantities of metal piled upon the ground on two sides of him, from two to twelve feet thick, and working within three or four feet of an operating gasoline engine, capable of lifting ten tons, the whole in an open junk

yard exposed to the sun, with the temperature of the general locality 89 degrees at eight o'clock in the morning and 100 degrees at noon, is in danger of heat prostration by reason of his position to a far greater degree than that to which the general public is exposed." Here there was natural heat accompanied by proximity to heat producing machinery and other such agencies.

In the *Keller* case the record discloses that on the day of the decedent's death the maximum temperature in the community was one hundred degrees in the shade, and that the work in which decedent was engaged was being done seventy-five feet from a large building, part of appellant's plant; and that in addition to the heat produced by the direct rays of the sun, decedent was also exposed on that day to the reflected heat of the plant buildings, the steel rails in the three sets of tracks and the cinders thereunder, and that it was much hotter in the place where decedent was working than at other places in the vicinity. On this showing the Court was of the opinion that the case was brought within the rule laid down in the *Collett* and *Rasmus* cases. It was thought that artificial or reflected heat was present to such an extent as to warrant the allowance of compensation. In all of those cases no question was raised as to death resulting from heat prostration, while here that question is raised not only by the contention of the parties, but from the surrounding circumstances as well. The record shows that the temperature was high, about ninety-three degrees. That is the only definite figure given, although one man gave as his opinion that the temperature was ninety-five to a hundred degrees. The temperature on the day of the death of the decedent was about the same as the day before, and this state of temperature had probably existed for several days. The only thing which might have elevated the heat above its natural force was the claimed reflection from the roof. It is quite clear that the conditions present in the *Collett* and *Rasmus* cases were not present here; and we think there is good ground for distinguishing the situation under consideration from that

existing in the *Keller* case, although, admittedly, the two cases come close together. In the *Keller* case, however, the temperature was much higher, and shown to be higher than at other places in the same community; there was the existence of steel rails and other artificial heat reflectors, calculated to engender heat to a much greater degree than the heat reflections from the roof here present. But, considering the matter from a reasonable standpoint, was the situation of the deceased herein different from that existing in that community, or different from the situation which commonly existed therein on that day among those who came in contact with the reflected rays of the sun, or those who were engaged in construction work, where steel, lumber, roofing, concrete and other building materials calculated to reflect the heat were used? We think it may fairly be assumed that many other persons worked on this ordnance plant on that day under substantially similar conditions. In our opinion that is the general public to which the decisions in the *Collett* and *Rasmus* cases relate. The effort to show that decedent's working place was in a hole cannot be sustained from any practical standpoint. The ordnance plant was being constructed in a river bottom containing in excess of four hundred acres of land, and while hills and mountains may have surrounded it, as is common in this State, it cannot be said to be a hole, or to have substantially affected the situation. If claimant's decedent was in a hole, the general public in that community was in the same situation.

Of course, the general public, in the broadest application of the phrase, includes all citizens, many of whom work in places where they are protected against heat through natural conditions or by artificial means. On the other hand, another portion of the general public works in the outdoors, where they receive the full force of the sun's rays, and the number who do so is large. Persons working around buildings, or in other situations where the sun's rays are reflected, may be said to take a greater risk, but must such persons be awarded com-

pensation in case of injury or death merely because they engage in such types of employment, and while engaged suffer a heart attack or are prostrated by heat? We think not, except in cases where there is some specific event, some special or particular risk or danger connected with the employment, and beyond that, to which those engaged in the same type of employment are subjected. That such work produces some risk to which the greater part of the general public is not exposed cannot be gainsaid; but our statutes do not seem to contemplate compensation for such risk, when not accompanied by a showing that the injury or death resulted from some special and specific cause, outside and beyond the general or common risk incident to that particular type of employment. Heat prostrations occur in all conceivable circumstances and to people of all classes and all employments are subject to them. This is the reason why where they occur in industry, it is necessary to show that they resulted therefrom, and to show this it must appear that some specific event, some special or particular risk or danger produced them. Otherwise it will be presumed that they resulted from natural causes to which the employment did not contribute. Generally speaking, compensable injuries are such as are produced from trauma, and in such cases there is usually no question that the injury was sustained in the course of and as a result of the employment. In other cases where there is no trauma, compensation is allowed. *Montgomery* v. *Compensation Commissioner*, 116 W. Va. 44, 178 S. E. 425. But in case of heart attack or heat prostration frequently occasioned by bodily and other conditions to which the employment may not in any wise contribute, we have great difficulty in determining what should be done. The consideration which this Court has given to cases of this character attests this difficulty. While we have awarded compensation in heat prostration cases, within strictly defined limits, as will appear from the *Collett, Rasmus* and *Keller* cases, we are not disposed to extend the rule laid down therein, and make it applicable to situations

not there present, and where the risks are less. Considering all that has been written on the subject, and appraising this case in its entirety, we are unable to see that the Commissioner and Appeal Board were justified in awarding compensation. To do so they must have held that decedent was exposed to a particular risk or danger attendant to his employment, to which the general public, as that phrase is herein interpreted, was not exposed, and we do not think the facts of this case justified such a holding.

The order of the Commissioner and Appeal Board is reversed and the claim denied.

*Reversed.*

KENNA, JUDGE, concurring:

To my mind the file in this case gives us two clear-cut issues of fact; first, was the decedent of claimant, by virtue of his employment, subjected to a greater degree of heat than those in the same neighborhood not so employed; and, second, if decedent was so exposed did his death result from heat prostration due to the exposure, or was it brought about by a heart attack? In order to make the decedent's death compensable both of these questions must be decided in favor of the claimant. The Court has decided that the testimony introduced does not justify a finding of exceptional or unusual exposure due to the decedent's employment, and this being so, the question of whether his death was due to heat exhaustion or to a heart attack becomes inconsequential and need not be discussed.

While I agree with the conclusion of the majority that the record does not show that decedent, by virtue of his employment, was exposed to unusual heat, I most positively disagree with the discussion of this question contained in the majority opinion, which places the comparison of exposure as between the decedent and his co-employees. I quote the majority opinion: "We think it may fairly be assumed that many other persons worked in this ordnance plant on that day under substantially

similar conditions. In our opinion that is the general public to which the decisions in the *Collett* and the *Rasmus* cases relate." This statement, to my mind, is plainly unsound.

It cannot be denied that if the exposure of the "many other persons" who worked on this plant is plainly shown to be, by reason of the employment, more intense than that of the general public in the same neighborhood, then, in all likelihood, they were all subjected to a danger resulting from the employment. There is no question but that such injuries arose in the course of the employment.

I agree with the statement in the second syllabus of the *Collett* case that an injury attributable to heat prostration traceable to a specific event occurring in the course of claimant's employment is compensable. I do not agree, however, with the discussion in the majority opinion, to the effect that this statement makes a specific event affecting the individual who is injured and distinguishing him from other employees, a required element of a compensable claim. In my opinion, if it is shown that the employment results to the employees in general in a heat exposure plainly shown to be more violent than that of the general public in the same vicinity, and any one or all of the employees is injured thereby in the course of the employment, the injury is compensable. Of course if the individual is exposed to heat in a degree that affects him only, the rule applicable to a class is applied, the difference being that in that case the class is limited to one person. That, however, does not necessarily exclude others who may be exposed in a less degree than that single individual, but nevertheless to a greater degree than the general public in the same neighborhood.

For the foregoing reasons it is my belief that the majority opinion unquestionably runs counter to the controlling principle underlying Workmen's Compensation cases, which is that Compensation Acts are to be liberally interpreted and construed.

I think also that the majority opinion, in applying the rule applicable to hypothetical questions in actions at law in compensation cases has adopted a rigidity that it is the purpose of Code, 23-1-15, to relax. The language of the section referred to is in part as follows: "The Commissioner shall not be bound by the usual common law or statutory rules of evidence, * * *". Of course it is the duty of the Commissioner to pass upon the admissibility of evidence, and also to weigh that evidence and find according to its value and amount. He is both court and jury. Even in actions at law that are submitted to the trial judge in lieu of a jury, the presumption is that he has not considered improper evidence, even though admitted, unless the fact that he has done so affirmatively appears. *Wolfe* v. *Ohio State Life Ins. Co.,* 113 W. Va. 884, 170 S. E. 182. See also, *Lindner* v. *Daniels,* 121 W. Va. 210, 2 S. E. 2d 267. I do not believe that a more rigid rule should be applied to compensation cases.