LUCILLE VENTO, WIDOW, *etc.*

*v.*

STATE COMPENSATION COMMISSIONER, *et al.*

(No. 9980)

and

(No. 9981)

Submitted September 3, 1947.   Decided October 21, 1947.

*Mahan, White, Higgins & Laird,* for appellant, New River Company.

*E. B. Pennybacker,* State Compensation Commissioner, and *John F. Bronson,* for appellant, State Compensation Commissioner.

*Thompson & Vickers,* for appellee.

578

KENNA, JUDGE:

Lucille Vento, widow of Daniel P. Vento, claimed compensation as a dependent of the deceased who lost his life March 16, 1945, while employed by the New River Company and while upon the tipple of its Collins operation at Glen Jean. The claimant protested a finding by the State Compensation Commissioner that her decedent had committed suicide and, after hearing, appealed the same finding to the Workmen's Compensation Appeal Board, which reversed the commissioner and entered its order awarding compensation to the claimant. The employer was granted this appeal and it now contends that the clear weight of the evidence establishes death by suicide or precludes a finding that it occurred in the course of and resulted from the deceased's employment, and further, that the findings of the commissioner are entitled to unusual weight since death occurred from the operation of an unusual machine which, together with its surroundings, the inspector of the commissioner had an opportunity to examine, whereas the decision of the appeal board is based upon the paper record only. The compensation commissioner, whose petition for an appeal was also granted, contends that there was no finding by him as to beneficiaries because his order refused compensation before that question was reached and hence it was not before the board on appeal.

Daniel P. Vento was thirty-nine years old, of average height, and weighed about one hundred and ninety pounds. He married Lucille Moses, widow-claimant, in 1932, when he was working for the New River Company as a coal inspector, a position that he occupied at the time of his death, probably having been promoted from a local inspector, whose duties are confined to a single operation, to that of general inspector with the duty of inspecting the work of the local inspectors at several operations in a certain area. He carried $5,000.00 life insurance with double indemnity. He and his wife owned their home at Scarbro, from which he went to Louisville, Kentucky, in February, 1945, to undergo a treatment for excessive

drinking to which he had been addicted for from three to four years. Mrs. Vento closed their home in Scarbro and lived with her mother in Oak Hill. Vento was discharged from a Louisville hospital and returned to the home of Mrs. Vento's mother in Oak Hill on the seventh day of March, 1945. On Saturday, the tenth day of March the Ventos went to spend the weekend with Mrs. Vento's brother at his home in Winona where they remained until Monday evening. Vento had been drinking heavily so that Mrs. Vento went to her mother's home at Oak Hill and he went to the home of his brother, Walter Vento, at Glen Jean. Vento had "passed out" and had to be carried into his brother's home. Dan's wife is supposed to have told Mrs. Walter Vento on Tuesday, the thirteenth, at Oak Hill that she had "completely finished" with him and that he was welcome to a division of their property. This was told Dan on Thursday. He is supposed to have told this same woman on Tuesday that he wished he could kill himself. At Scarbro on Christmas, 1944, after dinner in walking with Walter he said if he could get hold of a gun he would end it all. He was then drinking heavily. Walter said that Dan's wife told him not to let him get hold of a gun. Dan's wife went to Fayetteville and employed an attorney to bring a divorce proceeding on the ground of "habitual drunkenness." Process issued in spite of no bill having been filed and was served on the fifteenth of March. He drank two quarts of brandy on both Tuesday and Wednesday of the week in which he met his death, staying in his room in his brother's home, eating very little, getting up occasionally and coming down stairs, but going back to bed at once. On Thursday of that week he drank nothing but a relatively small amount of beer and on Friday morning, the sixteenth, got up early when his brother Walter went to work, told him that he was going to work that day, and shook hands with him upon parting. On that morning Dan went to work at around ten or ten-thirty and began the day at the Collins tipple of the New River Company at Glen Jean, where they were loading coal from a strip mining operation some distance from the tipple. He made two telephone calls from the foreman's

office near the tipple to the company's general office at Mount Hope in an effort to get in contact with the company's general manager, a Mr. McCauley, or with a Mr. Hunt. He told Mrs. Stover, who answered the telephone, that he had been "on another" and created the impression that he wished to find out whether he had been fired or was still on the pay roll. He called twice and did not get in touch with either Hunt or McCauley. Mrs. Stover testified that his talk was decidedly queer and that he did not seem to gather the sense of her replies or to be certain of what he himself had already inquired concerning. Upon going to work he talked with R. E. Core, then in charge of the coal dump near the tail sprocket, or bottom, of the coal conveyer belt in which he met his death, and told him that the coal running through the dump was dirty and that he intended to see that a Mr. Anderson in charge of strip mine production was reprimanded. Core said that in his judgment the coal was wet instead of dirty. Vento then asked him if it would be safe for him to ride on one of the trucks returning to the stripping operation and was told that of course it was safe. This he did, and was gone approximately one hour and on his return was seen entering the back of the tipple. This was the last occasion upon which he was seen alive. His body was discovered by his brother Walter Vento who was in charge of coal inspection at the Collins tipple.

The description of the tipple where Dan Vento met his death is not clearly stated by some of the witnesses. However, as a part of the employer's testimony there is a diagram drawn to scale showing a cross-section of the tipple, including the machines which, as coal carriers and shaker screens, operated thereon. Since the accuracy of this diagram is not questioned it, rather than uncertain testimony, will be used. No transverse diagram appears.

The end of the tipple toward the hill where coal is received, in this opinion, is called its "back" and its other end where coal after having gone over the shaker screens is loaded by gravity into railroad cars beneath those screens is called the "front." About twenty feet back of

the tipple the diagram shows what is called a "dump bin," being the place where the trucks bringing strip mined coal unloaded in order that it may be placed on an endless belt conveyer and taken up to the second floor of the tipple from where the sorting and loading process over the shaker screens is done by gravity. This endless belt conveyer is under the coal chute of the dump bin from where it carries the coal between thirty-eight and forty feet upward at an angle of about thirty-five degrees to the feeder of the shaker screens on the second floor of the tipple. The belt on which the coal is placed is thirty-seven inches wide with chains on both sides into which the teeth of sprockets fit at both the lower and upper end, there being two sprockets under the dump bin and two on the second floor of the tipple. Both the head sprockets and the tail sprockets are mounted on shafts. The sprockets at the tipple end of the conveyer are twenty-seven inches in diameter with teeth that protrude an additional four inches. There is no detailed description of the lower or tail sprockets, but by comparison appearing from the diagram their diameter is approximately two-thirds that of the head sprockets. Except at or near the head sprocket the conveyer belts are about twenty inches apart. Power is applied at the head sprockets and coal loaded on the outside of the belt conveyer is carried to the front of the second story of the tipple where it is loaded onto the shaker screens. The testimony is that it takes two minutes for the belt to go entirely around both the tail and head sprockets or one minute for the load on its upper or outer side to be carried to the second floor of the tipple.

The housing proper of the tipple stands approximately twenty feet from the dump bin and for that distance the conveyer belt runs through a box housing which ends at the tipple, the conveyer continuing through the tipple without housing for a distance of approximately another twenty feet until it reaches the upper sprocket on the second floor. Through this housing, until it reaches the tipple, parallel with and alongside of the conveyer belt, there is what is called a "catwalk" by which workmen can reach

the tipple from the dump bin. According to the diagram this catwalk ends at the tipple where three steps go from its end to the first floor. It does not extend to the upper sprocket, and the diagram shows no way that a person could walk close to the conveyer belt from the first to the second floor of the tipple.

The main housing of the tipple is about twenty feet square and twenty-four feet high, with a first floor at its lower level, and a second floor on which the upper or head sprocket of the belt conveyer is located about twelve feet above the first floor. The shaker screens are in front of this main tipple housing and over two railroad sidetracks on which the railroad cars to be loaded stand under the shaker screens. The main tipple housing is supported by uprights from the ground, at the front the first floor being about twenty-five feet and at the back about twelve feet from the ground. As has already been stated, the endless conveyer belt ran from beneath the dump bin back of the tipple to the front of the second story of the tipple where the coal was automatically loaded onto the shaker screens. In order to catch and save the slack that was otherwise wasted in the process of transferring coal from the conveyer belt to the shaker screens what was called a "dribble bin" with sides slanting inward, the bottom being about four feet by four feet and the top about eight feet by eight feet, was placed on the first floor directly under the head sprocket. This bin was emptied automatically by a device called a "dragline" so that its contents would reach the railroad car in which slack was being loaded. However, this device emptied the dribble bin only to within eight or ten inches of its floor, leaving that much slack in the bin.

Daniel Vento's body was found by his brother Walter between one and two o'clock on the early afternoon of Friday, with the head missing, at the side of the tail sprocket and in the endless belt conveyer on the side away from Glen Jean, indicating clearly that he was between the upper and lower belts of the conveyer when killed. His right leg was over the shaft between the two

tail sprockets and, in addition to the decapitation, his left arm was broken in a number of places and the left side of his back near the shoulder blade was terribly lacerated. After providing for the removal of the body a search at once was begun for the head, which was not found until after noon on Sunday when it was discovered at the bottom of the slack bin on the first floor of the tipple. During the course of this search Vento's work jacket was found at the back of the second floor of the tipple as though it had been lain on the floor by Vento. Vento's pocketbook was found in the slack bin on the first floor lying on a cake of slack that had stuck near the top of the bin. Bloodstains were found on the head sprocket and on the floor near that sprocket as well as on the outside of the slack bin and upon the stairs leading from the first to the second floor. What was identified as the pieces of Vento's upper denture were found in the railroad car in which slack was being loaded. All of the foregoing circumstances indicate clearly that Vento's death was caused by his neck being crushed and his head cut off by the head sprocket and the conveyer chain while in operation.

In considering the question of whether the record before this Court shows that the claimant's decedent met his death by suicide or by accident, this Court of course must first consider the express provisions of the compensation act. Code, 23-1-15, contains the following language: "The commissioner shall not be bound by the usual common law or statutory rules of evidence, * * *." In considering that provision this Court has used the following language: "We have here not only the explicit sanction for a departure from the common law rules of proof but a direct legislative command that the commissioner shall not be bound by 'common law or statutory rules of evidence'." *Machala* v. *State Compensation Commissioner*, 109 W. Va. 413, 416, 155 S. E. 169. The provision in question was a part of the compensation act when the appeal board was created and consequently governs the hearings before that board as well as the hearings before the compensation commissioner. Upon appeal to the appeal board we

have held: "The finding of the commissioner wholly disappears, with all presumptions which might have attached thereto. The appeal board displaces the commissioner, and becomes the sole fact finding body to be thereafter considered in the case. The order of the appeal board is a wholly new finding, which superseded that of the commissioner for all purposes." *Manning* v. *State Compensation Commissioner*, 124 W. Va. 620, 625, 33 S. E. 2d 299. See also *Burgess* v. *State Compensation Commissioner*, 121 W. Va. 571, 5 S. E. 2d 804; *Moore* v. *Workmen's Compensation Appeal Board*, 118 W. Va. 578, 191 S. E. 292; *George's Creek Coal Company* v. *Workmen's Compensation Appeal Board*, 117 W. Va. 89, 183 S. E. 866; *Rasmus* v. *Workmen's Compensation Appeal Board*, 117 W. Va. 55, 184 S. E. 250.

In the light of the foregoing we are of the opinion that the decision of the question presented by this review is not controlled by the authorities cited by counsel for both the employer and the employee concerning the "presumption against suicide," and its effect in actions at law, and whether or not that presumption is to be regarded as a presumption of fact going directly to the jury or as a presumption of law concerning only the attitude of the court in requiring the production of evidence. However, though the commissioner is not bound by the principles governing the introduction of testimony at common law, it is inevitable that certain general rules should be evolved in the course of time which would govern, at least to some extent, the introduction and consideration of evidence by the commissioner. One of these is that although the plaintiff must show that the injury for which he claims compensation occurred in the course of and resulted from his employment, the evidence is to be construed liberally in his favor and he is entitled to the benefit of every reasonable inference that can be drawn therefrom. *Walden* v. *State Compensation Commissioner*, 112 W. Va. 571, 575, 166 S. E. 6; *Lively* v. *State Compensation Commissioner*, 113 W. Va. 242, 167 S. E. 583; *Demastes* v. *State Compensation Commissioner*, 112 W. Va. 498, 165 S. E. 667; *Wat-*

*kins* v. *State Compensation Commissioner,* 114 W. Va. 507, 172 S. E. 715. We will attempt to discuss this matter in the light of those two general principles which, along with the settled principle that a finding of fact by the appeal board is not to be disturbed unless shown to be clearly wrong, in our opinion, are controlling.

If this Court were acting as a fact finding tribunal, we should say that from the circumstances shown by the record before us it would be quite difficult for us to decide whether death was due to suicide or accident. Yet from the fact of his death and the condition of his body when found, it is certain that he did meet death in one way or the other. In spite of the fact that his work jacket was found on the upper floor of the tipple, where apparently he had laid it, from the employer's diagram it is well nigh a physical impossibility that a man his size could have gotten into the space between the upper and the lower belt of the coal conveyer from the second floor, because the shaft of the upper sprocket was not more than six inches from the floor. This sprocket was twenty-seven inches in diameter. Since the conveyer belt reached the second floor at an angle of approximately thirty-five degrees, its approach to the upper sprocket formed a triangle, the sides of which were the floor, the upper sprocket and the upper belt of the conveyer. This triangular opening apparently is the only way a person could get between the belts of the coal conveyer from the upper floor. At the upper sprocket where the second floor opening to the conveyer would be larger than elsewhere, it would be less than twenty inches high from the floor. This triangular opening into the conveyer comes to point a little more than three feet from the upper sprocket, so that the opening into the space between the upper and the lower belt of the conveyer would be less than twenty inches at its greatest height and within a little over three feet, at a thirty-five degree angle, would reduce itself to nothing. This record does not dwell upon the question of whether a man of average height weighing between one hundred and ninety and two hundred pounds could enter an aper-

ture of that size and form, or whether it would be a physical impossibility. We believe its occurrence is extremely unlikely.

The only way that the point of contact between the conveyer chain and the upper sprocket can be reached, other than from the second floor, is from the catwalk leading from the dump bin to the first floor. This catwalk runs parallel to the conveyer for about one-half of its length, there being no catwalk between the first and second floor. A person wishing to reach the upper sprocket from the catwalk would be obliged to crawl into the conveyer below the first floor and crawl up at an angle of thirty-five degrees between belts twenty inches apart a distance of about twenty feet. This would be an extremely difficult if not impossible performance for a man weighing not less than one hundred and ninety pounds, with the conveyer not in motion. If the conveyer were moving it would be in an opposite direction increasing the difficulty greatly.

We are of the opinion that both the claimant and the employer have assisted the commissioner and the appeal board to the full extent of the means at their disposal in attempting to arrive at definite proof of the cause of Vento's death and that it is not possible to conclude that the appeal board's finding that his death occurred in the course of and resulted from his employment is clearly wrong, since under our holdings all reasonable inferences and doubt are to be resolved in favor of the employee.

We are of the opinion that the contention of the employer to the effect that under the circumstances of this case the findings of the commissioner, based partly upon physical examination of the premises by his inspector, are entitled to more weight than that of the appeal board is completely answered by the *Manning* case and those therein cited. To the exact contrary of that position are the numerous cases decided by this Court holding, in effect, that upon appeal to this Court it is the order of the appeal board, not that of the commissioner, that is under

attack and is to be sustained on findings of fact unless shown to be clearly wrong.

The appeal board's decision that the death of Daniel P. Vento is compensable is therefore affirmed.

In a brief filed on behalf of the commissioner the question is raised that the order of the appeal board is in error in awarding compensation to Lucille Vento because the finding of the commissioner refusing compensation prevented the commissioner from reaching and passing upon the question of whether there were beneficiaries entitled to receive compensation and that, therefore, that question not having been considered by the commissioner, was not before the appeal board upon appeal to it. We are of the opinion that the commissioner's contention is correct and that therefore this matter must be remanded to the commissioner for the purpose of ascertaining and deciding whether there are beneficiaries who are entitled to accept an award of compensation. It is accordingly so ordered.

*Affirmed in part;*
*reversed in part.*