Mrs. Carrie Morris

*v.*

State Compensation Commissioner

(No. 10340)

Submitted January 10, 1951.     Decided March 1, 1951.

Fox, President, dissenting:

*Hillis Townsend,* for appellant.

*William R. Laird,* and *Mahan, White & Higgins,* for appellee.

Lovins, Judge:

This is a statutory appeal from an order of the Workmen's Compensation Appeal Board, denying workmen's compensation benefits to Mrs. Carrie Morris, hereinafter referred to as "claimant", whose deceased husband, Harry Morris, at the time of his death, was an employee of the Page Mining Company, hereinafter referred to as "employer."

Harry Morris, a sixty-one year old pump man, was found dead in the employer's mine on the afternoon of February 17, 1949. The widow's claim, based on the contention that death was due to an electrical shock sustained by her husband in the course of his employment, was originally rejected by the State Compensation Commissioner on the ground that Morris's death was not due to an injury received in the course of and as a result of his employment. The certificate of death, furnished by the claimant with her application for benefits, and then considered by the commissioner, stated that the cause of death was unknown.

A pathologist, in a report of an autopsy performed on the day of death, stated that the cause of death was undetermined, but that a terminal event in the death of Morris was edema of the brain and meninges. According to his report, decedent's son had told the pathologist that on the morning of his death his father had mentioned casually that "he was so tired that he would rather stay at home than go to work." The employer in its report to the commissioner was unable to account for the death of its employee.

Hearings were held by the commissioner pursuant to a protest filed by the claimant, and the following facts were developed.

Several employees with whom Harry Morris was working testified that he appeared to be in good health when he reported for duty on the day of his death, and that he seeemed to be in good physical condition during the course of the morning's work. At approximately 2:15 P.M., the customary quitting time, the decedent was not present for the trip out of the mine. His fellow employees, being concerned over his absence, went to a section of the mine where Morris had gone to change the discharge lines on a pump. The work to be done by decedent consisted of taking a hose from the end of one pipe and putting it on the end of another. Decedent was found dead, lying on his back, both hands down by his sides. His body was

partly under one of the discharge lines of the pump and across two return ground wires, one of which was un-insulated. His head was even with the motor of the pump. The body was not touching the pump, the motor or the discharge pipe, which was about three feet above the ground. The pump motor was not running, and the job which decedent was sent to do had not been performed.

The clothing of the decedent was wet, and he had vomited. There are two possible ways to account for the fact that Morris's clothing was wet. One witness testified that it was impossible for a person to perform the duties of pump man without getting wet. There is testimony that there was a water hole along the most direct and convenient approach to the pump. It is certain that if Morris had gone through the water hole, his clothing would have been at least partially wet.

The motor of the pump where decedent's body was found was operated by electricity, which was obtained by connecting the wire leading to the motor with the main current wire, sometimes called the "trolley wire". Such connection was effected by manually placing the nip of the motor wire over the trolley wire. To stop the flow of electric power into the motor wire, the nip had to be removed. · Decedent could not have done the work which he intended to do without first cutting off the pump motor, and removal of the nip was the only manner in which that could have been done.

A portion of the electric wire leading to the pump was immersed in the above-mentioned water hole, and one witness, a member of the searching party, testified that he removed the nip of this wire from the trolley wire before the party passed through the water, the witness being fearful that unless this precaution were taken, the water would be charged with electricity. The plain inference from such evidence is that the decedent, if he had passed through the water, might have been electrocuted. There is no evidence as to the distance from the water hole to the place where the body was lying. In view of the testi-

mony of the witness, that he had removed the nip and thus stopped the pump motor, it is reasonable to say that the motor was running at the time of decedent's death, and that the flow of electric power to the pump motor had not ceased at that time.

There is no evidence as to the voltage of electric power transmitted by any of the wires mentioned in the record.

The autopsy report disclosed no pathological symptoms or indications of electrocution. The mortician, who prepared the body for burial, testified that there was a brown mark about three-fourths of an inch long on the back of the left hand. The mark, though present before and after embalming, was more pronounced after embalming. Two witnesses who saw the body the following day said that they noticed a mark on the right temple about the size of a half dollar; that there was a mark extending across the inside portion of the fingers on the left hand; and that the hand appeared to be drawn into a cupped shape. The examining pathologist testified that he had removed a scab from the brown mark on the back of decedent's left hand, and that he concluded, after microscopic examination, that the lesion was not of recent origin. The witness further testified that the mark on the temple was a superficial skin lesion of recent origin caused by scratching over a rough surface. He stated as his conclusion that neither mark contributed to decedent's death. The pathologist further testified that decedent could have suffered an electrical shock without the body showing either pathological change or external marks. But in ninety to ninety-three per cent of cases of electrocution there are obvious marks resulting from it.

There is no evidence to show that decedent had been in ill health prior to the date of his death.

On April 24, 1950, the Compensation Commissioner set aside his former ruling, and allowed the widow's claim, awarding her the benefits as provided in the statute. An appeal was taken to the Workmen's Compensation Appeal Board. The commissioner's ruling was reversed by the

appeal board, and benefits were denied on the ground that the claimant had not shown by a preponderance of the evidence that the death of the decedent resulted from his employment.

It is clearly shown that the death of the decedent occurred in the course of his employment. Therefore, the single issue presented upon this appeal is whether decedent's death resulted from his employment.

This Court has stated on many occasions that a spirit of liberality should be employed in applying the provisions of the Workmen's Compensation Act. *Miller* v. *Comp. Com'r.*, 126 W. Va. 78, 81, 27 S. E. 2d 586; *Chiericozzi* v. *Comp. Com'r.*, 124 W. Va. 213, 217, 19 S. E. 2d 590; *Lester* v. *Comp. Com'r.*, 123 W. Va. 516, 520, 16 S. E. 2d 920, 923; *Prince* v. *Comp. Com'r.*, 123 W. Va. 67, 13 S. E. 2d 396; *Burgess* v. *Comp. Com'r.*, 121 W. Va. 571, 573, 5 S. E. 2d 804; *Martin* v. *Commissioner*, 111 W. Va. 420, 162 S. E. 486; *Vandall* v. *Comp. Com'r.*, 110 W. Va. 61, 158 S. E. 499; *Bonner* v. *Comp. Com'r.*, 110 W. Va. 38, 156 S. E. 847; *Kincannon* v. *Comp. Com'r.*, 107 W. Va. 533, 149 S. E. 665; *Caldwell* v. *Comp. Com'r.*, 106 W. Va. 14, 18, 144 S. E. 568.

The record discloses no direct evidence of how the death of Harry Morris occurred, but the absence of such evidence does not preclude an allowance of compensation benefits, if circumstances are shown from which it may be inferred that his death resulted from such employment. While it is incumbent upon the claimant to establish her claim by a preponderance of the evidence, this may be, and is, done by establishing physical facts that would warrant an inference that death was due to an injury received in the course of and resulting from the decedent's employment.

The rigid rules of evidence and proof which prevail in the trial of actions at law do not govern proceedings in claims for workmen's compensation. "The commissioner shall not be bound by the usual common law or statutory rules of evidence * * *." Code, 23-1-15. "We have here

[Code, 23-1-15] not only the explicit sanction for a departure from the common law rules of proof but a direct legislative command that the commissioner shall not be bound by 'common law or statutory rules of evidence.'" *Machala* v. *Comp. Com'r.*, 109 W. Va. 413, 416, 155 S. E. 169. "* * * facts are permitted to be established by informal methods, decisions made therefrom, and probabilities weighed in a manner which would not be permitted in the trial of an action at law, governed by the more or less rigid rules of evidence applicable to such cases." *Pannell* v. *Comp. Com'r.*, 126 W. Va. 725, 731, 30 S. E. 2d 129. The provisions of Code, 23-1-15, likewise govern proceedings before the Appeal Board, *Vento* v. *Comp. Com'r.*, 130 W. Va. 577, 44 S. E. 2d 626.

While a finding of fact by the Appeal Board is not to be disturbed unless shown to be clearly wrong, such rule is not applicable where the facts are undisputed, and the record will admit of reasonable inferences favorable to the claimant. *Demastes* v. *Comp. Com'r.*, 112 W. Va. 498, 165 S. E. 667; *Goble* v. *Comp. Com'r.*, 111 W. Va. 404, 162 S. E. 314; *Poccardi* v. *Public Service Commission*, 75 W. Va. 542, 84 S. E. 242. In the instant case, the claimant is aided by such inferences from the physical facts which have been established. Decedent's body was found lying across two electric wires, one of which was not insulated. His clothing was wet and he had vomited. The motor wire was partially immersed in a water hole through which it was necessary to pass to reach the pump. In order to stop the flow of electricity to the pump motor, it was necessary to remove the nip of the motor wire from the trolley wire, and such removal was effected by a member of the searching party after decedent's death, which fact indicates that the pump motor was running at the time of his death. Although a pathologist, who performed a thorough and complete post-mortem examination of decedent's body, reported no pathological change or external marks indicating electrocution, he testified that death could have resulted from electrical shock without such evidence being present after death. The foregoing

facts, in our opinion, warrant an inference that death was probably due to electrocution.

The theory upon which the employer would resist an award of compensation, that death probably resulted from natural causes, is based on unsupported conjecture. There is nothing in the record of this case to indicate that Morris was suffering from ill health either before or on the day of his death. It is true that the decedent's son told the examining pathologist that his father had said on the morning of his death that "he was so tired that he would rather stay at home than go to work," but we do not deem this casual remark of the father to his son as evidence of ill health. Moreover, the sole abnormal finding in the report of autopsy is an edema of the brain and meninges, which the pathologist has stated was a terminal event in the death of Morris but not the cause of his death.

The employer contends that the case at bar is similar to that with which the Court was presented in *Williams* v. *Comp. Com'r.*, 127 W. Va. 78, 31 S. E. 2d 546. But we do not consider the *Williams* case as analagous to the instant case. In the *Williams* case it was definitely established that the employee's death was due either to heat prostration or to a heart attack, the sole question for decision being whether his death from a diseased physical condition was caused by some special or particular risk or danger attendant upon his employment. In the instant case the death, if connected with the decedent's employment at all, must be characterized as traumatic, since no indication of disease or organic deficiency which would cause death is disclosed by the complete and full autopsy performed by the pathologist.

The holding of this Court in *Demastes* v. *Comp. Com'r.*, *supra*, states a sound principle. In the *Demastes* case, the decedent, who worked alone, was found dead, lying on the ground, at the site of his work. The exact cause of his death was not disclosed, but the physical facts indicated that he had probably fallen or jumped about six or eight feet to the ground from a log. Although there was evi-

dence that prior to the day of injury the decedent had suffered from sick headaches, neuralgia of the stomach and heart trouble, the Court rejected the theory that death was due to natural causes as being negatived by the undisputed physical facts. In the *Demastes* case the Court stated the basis of its conclusion in the following appropriate language: "We are not impressed with the theory that death resulted from a diseased physical condition. Testimony relating to such a theory does not negative the physical facts which stand undisputed; and since it is not a strained inference to connect death with the events which the physical facts indicate, we prefer probability rather than mere conjecture."

A casualty, disease or failure of some vital organ "severs the thread of life" of a human being. There is no material evidence that decedent suffered from any disease, and there is no evidence that any of his vital organs had failed to function. If the decedent had suffered from a disease or organic failure, such fact would undoubtedly have been disclosed by the full and complete autopsy. Death of the decedent from natural causes being eliminated, we think nothing remains as the cause of his death except a casualty. Decedent having been found dead in the circumstances hereinbefore stated, there remains the outstanding probability that he was electrocuted as a result of his employment.

Accordingly, the order of the Workmen's Compensation Appeal Board is reversed and the order of the State Compensation Commissioner is reinstated.

> *Order of Workmen's Compensation Appeal Board reversed; order of State Compensation Commissioner reinstated.*

Fox, PRESIDENT, dissenting:

I cannot concur in the majority opinion in this case, and, therefore, file this dissent. Said opinion contains a fair statement of the known facts surrounding the death of

Harry Morris, claimant's decedent, and I shall devote no time to discussing those facts, but will present my disagreement with the reasoning on which that opinion is based. One thing seems to be admitted by everyone, and that is that the cause of the death of Harry Morris has not been, and will probably never be determined. The majority opinion is based entirely upon simple conjecture as to what caused his death, and, as I view the case, every inference that he might have died through natural causes is rejected, leaving nothing except mere conjecture, upon which an inference is based, that he died from an electric shock while engaged in his employment. Men die suddenly from natural causes, and without any previous indication of physical ailments of any kind, and without any revealment of the cause of death. It is just as probable that Harry Morris died of some physical ailment, not connected with his employment, as it is that he died from electrocution while engaged in his employment, in which event, of course, his widow would be entitled to compensation.

The evidence shows that Harry Morris was not feeling well on the day of his death, and vomit was found near his body after he was dead. What this indicates, I do not know; nor do the experts who had an opportunity to study the case reach any conclusion on that point. Electricity is employed in all large coal mines, and, of course, electrical current was present in the mine in which Morris died. It is just as probable that he died a natural death, as it is that he was electrocuted. Notwithstanding the liberality indulged in all compensation cases in favor of claimants, as it should be, the claimant bears the burden of proof and must establish the claim by a preponderance of the evidence. No rule of liberality should lead us to depart from the fundamental principle of law that he who asserts a claim has the burden of establishing it. The majority opinion states that the theory upon which the employer would resist an award of compensation, on the ground that death probably resulted from natural causes, is based upon unsupported conjecture. Let us admit this. On the other hand, the claim that his death resulted from

electrocution is also based on unsupported conjecture. Why discard one conjecture, and fully and completely accept the other? In that connection, says the majority opinion, "There is nothing in the record of this case to indicate that Morris was suffering from ill health either before or on the day of his death.", then explaining that while it was true that the decedent's son stated that his faher said on the morning before his death that he would rather stay at home than go to work. This remark, called casual, is entirely ignored. The fact that vomit was found near him after he died did not register with the writer of the majority opinion. But, in this connection, it is stated that the sole abnormal finding in the report of autopsy is an edema of the brain, which a pathologist found was a terminal event, but not the cause of his death.

An able pathologist performed a complete autopsy on the body of the decedent. He reported that he found no pathological symptoms or indications of electrocution, but testified that death could have resulted from electrocution, without such evidence being present after death. The opinion then states: "The foregoing facts in our opinion warrant an inference that death was probably due to electrocution." The mere fact that that death could have resulted from electrocution, a mere conjecture, is held to warrant an inference that death resulted from electrocution. Can this be the law?

Now in the first place, a finding based upon a mere probability is not usually upheld by the courts. In criminal cases, in particular, juries are often told that no degree of probability of guilt will suffice to convict a defendant. Of course, rules of evidence, with respect to criminal charges, are more favorable to a defendant than in law actions or in proceedings such as a claim for compensation. But even in a civil case, probability is not permitted to support a verdict unless there is some showing in the case that practically eliminates any other conclusion. To create an inference, itself based on conjecture and speculation, and base a finding of electrocution on the tes-

timony of a competent pathologist that he could find no pathological charge or external mark indicating electrocution, although at the same time he testified that death could have resulted from an electric shock, simply carries things too far, and such a rule of evidence has never been applied in any court that I know of.

To show the extent to which the Court has gone to make this award of compensation, the same pathologist stated that in ninety-three cases out of one hundred, where death resulted from electrocution, some showing of that fact would appear externally upon the body of the deceased. This would certainly create an inference that Harry Morris died from some cause other than electrocution; and yet the seven chances that he might have died from electrocution are used as a basis for an inference that he did so die; and the ninety-three chances that he died from some other cause are ignored. This is carrying conjecture too far, even if it were permitted at all; and, of course, any lawyer knows that a court of law cannot reach conclusions in favor of either party based on mere conjecture.

The majority opinion is in direct conflict with the case of *Williams* v. *Comp. Com'r.*, 127 W. Va. 78, 31 S. E. 2d 546. That case is ignored, discarded as inapplicable for no reason that I can see. As correctly stated in the majority opinion, it was well established that the death involved in that case was due to either heat prostration or to a heart attack. The doctors could not agree as to what caused death. One of them thought death was caused by heat exposure, but admitted that it might have been caused by a heart attack; and the other admitted that it could have been caused by a heart attack, but in his opinion heat prostration was the cause of death, in which event claimant's widow would have been entitled to compensation. This Court held that the claim had not been established. In principle, I can see no distinction whatever between that case and the case at bar. The majority opinion is attempted to be sustained by reference to the case of *Pannell* v. *Comp. Com'r.*, 126 W. Va. 725, 30 S. E. 2d 129. That

was a case where the claimant's decedent suffered from high blood pressure. He was working in a mine and broke through into an abandoned section of the mine. This Court assumed that the air from that abandoned section of the mine was impure and dangerous, and that the sudden death of claimant's decedent was caused by coming in contact with that dangerous air. That case was criticized as being too liberal. However, it does not support the present claimant, because there was a specific isolated event which, in all reasonable probability, had caused death and made that death compensable. Here there is nothing of that character. There was no specific event from which anyone could reasonably draw the conclusion that claimant's decedent came in contact with electricity and thereby lost his life. All we can say is that he might have done so.

I agree with everything that has been said in the argument of this case, and in the majority opinion, that in compensation cases the law should be interpreted with great liberality in favor of claimants. The statute itself is a humanitarian one, and the result of the State's act in trespassing on private rights to the extent of imposing liability on employers for compensation for death or injury without wrong on their part, and on the other hand curtailing the rights of injured persons, and their wives and children in case of death, from instituting actions of law against employers for injuries or death. The Legislature in taking this marked and humanitarian step, to provide against, so far as possible, fatalities which grow out of our industrial age, must have contemplated that the laws it enacted should be liberally construed and liberally applied in favor of the employee; but I cannot concur in an opinion which, in my judgment, departs from fundamental and well settled principles of law, as applied to the evidence necessary to establish a claim for compensation. Whenever we depart from those principles, and apply the law to one group of people in one way, and apply the same law to another group of people in a different way, we are simply leading the way to judicial an-

archy, and, if that practice be followed, cases will be decided according to the personal inclination of the court hearing them regardless of the character or weight of the evidence. I think no one gains from any departure from old and well settled principles. I do not think that this or any other court in the land would, in a civil case between two litigants engaged in private enterprise, and on mere conjecture, and in a situation kindred to the one presented in this case, permit a recovery. All courts in dealing with compensation want to grant compensation. But we should not set up special rules, and violate fundamental rules of law and evidence to do so.

There is another rule of law which is plainly violated by the majority opinion, and that is that this Court will not reverse the Compensation Appeal Board unless it believes them to be plainly wrong. Scores of cases decided by this Court state this as a plain principle that should govern our decisions in this class of cases. In a case where no one knows what has happened, but where some decision is necessary, there can be no basis for an opinion which overrules the fact finding body. There is nothing here that plainly shows that the Appeal Board was wrong. In such a case, it must follow that a claimant who failed to meet the test by failing to substantiate his claim by evidence, or circumstances that may be properly taken into consideration, the claimant simply loses his case. He is not entitled to win because the personal inclination on the part of the courts is to be liberal towards people who come within the compensation laws of the State. No doubt this allowance to this widow will take care of her, in a measure, for the remainder of her life, and it is but natural that courts should have an inclination to make awards without too strict regard to law. All this may be highly commendable from the emotionable viewpoint, but the courts sit to administer justice according to the law which has been set up for the settlement of disputes. There should be no departure from the rules of law which requires that he who presents his case must establish it by a preponderance of the evidence and circumstances.

I do not think what has been presented in this case affords any grounds whatever for any inference that claimant's decedent died from electrocution or from natural causes; we simply do not know what caused his death; and when in this situation the Court goes out of its way to overrule the decision of the Appeal Board upon an inference based upon conjecture and allows the claim, it has, in my opinion, committed grave error affecting fundamental principles of law and justice.

I am authorized to state that Judge Haymond joins in the views herein expressed.