GRACE VANKIRK

*v.*

STATE COMPENSATION COMMISSIONER AND LOCKSLEY FUEL CORPORATION (NOW CHRISTOPHER FUEL CORPORATION)

(No. 11055)

Submitted April 21, 1959.          Decided May 19, 1959.

*Charles H. Haden,* for appellant.

*Clark B. Frame,* for appellee.

GIVEN, PRESIDENT:

Claimant, widow of O. R. Vankirk, an employee of Locksley Fuel Corporation, claims benefits as a dependent

under the workmen's compensation acts. The State Compensation Commissioner held that claimant was not entitled to benefits, on his finding that the death of the employee did not result from an injury suffered in the course of his employment. The Workmen's Compensation Appeal Board reversed the order of the commissioner.

The employee, about fifty four years of age, on December 12, 1956, while in the employment of Locksley Fuel Corporation, predecessor of Christopher Fuel Corporation, in the course of such employment, suffered a severe injury to the left middle finger, necessitating the amputation of the entire finger, which was done on the twentieth day of December, 1956. The employee was granted and paid a seven per cent disability for loss of the finger. In a very short time after the finger was amputated, though the lacerations necessitated by the amputation healed uneventfully, the employee complained of paralysis and blindness, and "became so weak that he was unable to walk or to control his fingers". On December 31, 1956, his family physician found "This man presented quite a problem to me. This blindness and paralysis of his arm and so forth * * *". He was admitted to Johns Hopkins Hospital February 14, 1957, and discharged therefrom March 26, 1957. Though numerous examinations and tests were made by the hospital, the cause or origin of the affliction was undetermined. The hospital report shows that "certain elements in the examination are suggestive of polyarteritis, although this diagnosis can not be substantiated".

The employee, on August 19, 1957, was examined by Doctor Lawrence S. Miller, who states in a letter-report that "He was brought to the office in a wheelchair, and he was found to be very severely disabled. He was unable to raise either arm, or to open his tightly clenched hands, or to stand at all by himself, and in fact, he showed an almost complete paralysis of his right leg and he was unable to move it at all." Doctor Miller further stated: "It was difficult to see how this patient's

middle finger injury of the left hand could have produced this severe amount of disability which he shows at the present time. At the present time the patient is certainly 100 percent disabled, but I could see no relationship between this and the finger amputation." Doctor Miller, however, was unable to diagnose the affliction, or to give any light on its origin or cause.

The deposition of Doctor C. Arch Logue, the family physician of the employee, was taken. From his testimony, and as well from the deposition of the widow-claimant, it appears that the employee, to the time of the injury, was "in general good condition; he always worked". Doctor Logue testified to the effect that polyarteritis is a collagen disease and "a primary disease of the walls of the blood vessels, and one theory on it is that trauma can produce this thing". He further testified to the effect that "As I say, I cannot say definitely that this injury caused this man's death, because I don't know. As I said before, he was well until this injury, and he was never well afterwards,  so I would have to say that I felt the injury contributed to his death, because there is no other way for me to explain it"; that after the amputation "the color" of the left hand "wasn't good. I mean the flap had grown over, but instead of having a nice pink color to the skin in that entire hand it kind of branched out and was white, and the circulation wasn't good"; and that the first limb that the paralysis affected "was the left hand, the one which he had injured, and the one that the finger was amputated on". On the death certificate of the employee Doctor Logue wrote "hypostatic pneumonia" and "polyarteritis nodosa"; and explained that was "for want of a better diagnosis". The employee died as a result of the affliction October 21, 1957.

Thus it seems undisputed that prior to the injury to the finger, which injury was held compensable, the employee was in good health; that almost immediately after the amputation of the finger the affliction which caused his death became apparent and continuously pro-

gressed in its crippling and deteriorating effects, causing his death; that the nature of the affliction was not definitely determined; that whether the affliction existed at the time of the injury or whether it resulted from the injury or the amputation was not definitely determined; that one physician was of the opinion that the injury had no connection with the affliction; that one physician was of the opinion that "the injury contributed to his death"; and that no independent cause of the death could be discovered.

The facts, we think, bring the case clearly within the holding of this Court in *Pripich* v. *State Compensation Commissioner, et al.,* 112 W. Va. 540, 166 S. E. 4: "1. Where, in the course of and arising out of his employment, an employee in good health and of strong physique, suffers physical injury which is followed by serious disabilities, competent physicians differing as to whether the disabilities are attributable to the injury, but only probable or conjectural reasons or causes are assigned by physicians in an effort to explain the disabilities on grounds other than the injury, the presumptions should be resolved in favor of the employee rather than against him." See *Morris* v. *State Compensation Commissioner,* 135 W. Va. 425, 64 S. E. 2d 496; *Pannell* v. *State Compensation Commissioner,* 126 W. Va. 725, 30 S. E. 2d 129; *Keller* v. *State Compensation Commissioner,* 125 W. Va. 185, 24 S. E. 2d 81; *Manning* v. *State Compensation Commissioner,* 124 W. Va. 620, 22 S. E. 2d 299; *Collett* v. *State Compensation Commissioner,* 116 W. Va. 213, 179 S. E. 657; *Demastes* v. *State Compensation Commissioner,* 112 W. Va. 498, 165 S. E. 667; *Hall* v. *State Compensation Commissioner,* 110 W. Va. 551, 159 S. E. 516.

In the *Pripich* case the testimony of one physician was to the effect that claimant was suffering from hypertropic arthritis, not due to the injury, and one physician was of the opinion that "his trouble was probably traumatic arthritis". The Court stated: "If the disabilities cannot with some degree of certainty be attributed to a cause other than the injury, we are of opinion that the

conclusion must prevail that the claimant is suffering from progressive results of his injury of December 8, 1927".

In the *Pannell* case "One physician testified that, in his opinion, the hemorrhage was caused by contact with poisonous gas; one that he does not think the hemorrhage was the result of poisonous gas; and two others that they saw no sign of gas poisoning. There is testimony that gas poisoning usually results in diversified hemorrhage and not a rupture, such as we have in the case at bar; but there is no contention here that there was gas suffocation"; and "What is claimed is that the bad air in the mine raised the blood pressure and caused the brain artery to break down. No one knows what caused this break-down. It might have occurred had the air been entirely safe. But in this world there are many things about which we cannot be certain. We are often called upon to determine matters where there is no satisfactory proof on which to base a decision, and yet a decision must be made. In such circumstances, we are driven to rely upon presumptions and probabilities. This is not uncommon in civil cases of all types, and there is no reason why it should not be followed in compensation cases. Indeed, there are special reasons why the principle should be applied in such cases, over those which justify its use in ordinary civil litigation. There is, of course, no presumption in the case before us; but there are facts from which we can say that, in all probability a particular result followed * * *". It was held: "Where death ensues following a cerebral hemorrhage, suffered by an employee in the course of his employment, immediately following a specific isolated event which might have caused the same; and there is no clear showing that the hemorrhage resulted from other causes; compensation should be awarded to the dependents of the deceased on the basis that his death occurred in the course of and resulting from his employment."

Though the diagnosis of the affliction which caused the death of the employee was not definite, and it was

not definitely established that the affliction resulted from the injury or amputation, it is not disputed that he was in general good health prior to the injury, and that the affliction which caused his death commenced almost immediately after the injury; that the suspected disease, polyarteritis nodosa, according to one theory, at least, could be of traumatic origin, and that none of the many physicians who participated in the examinations and tests discovered any fact indicating any independent cause of death. We must infer from such facts "that, in all probability a particular result followed", that of death from the disease resulting from the injury or the amputation.

The order of the Workmen's Compensation Appeal Board complained of is affirmed.

*Affirmed.*