BETTY J. BARNETT, *Widow, etc.*

*v.*

STATE WORKMEN'S COMPENSATION COMMISSIONER *and* GAULEY COAL & COKE COMPANY

(No. 12906)

Submitted February 10, 1970.     Decided March 3, 1970.

*Dan O. Callaghan,* for appellant.

*James A. Barber,* for appellees.

BROWNING, PRESIDENT:

Garcie Barnett was employed by the Gauley Coal and Coke Company as foreman of a three-man "moving crew" and as a result of circumstances that will be related in detail hereinafter, occurring about three hours after his "shift" began, he was admitted to the Sacred Heart Hospital during the early morning hours of April 10, 1968. His attending physician saw him after his admission to the hospital and diagnosed his condition as "a coronary occlusion." The patient died on April 12 of what his physician diagnosed as a recurrence of the heart attack which he had suffered two days previously. The widow and minor dependent children of the deceased filed application for workmen's compensation benefits upon the theory that the deceased's death was due to an injury received in the course of and resulting from his employment. These parties will hereinafter be referred to as appellees and the coal company as the appellant. All Code references in this opinion are to the articles, sections and subsections of Chapter 23 of the Code of West Virginia as amended prior to the death of Barnett. The commissioner originally denied benefits to appellees upon the ground that "deceased husband's death was not due to

the injury received in the course of and as a result of his employment." There was a protest and after three hearings the commissioner set aside his former ruling, held the claim compensable, and made an award to each of the appellees. On November 21, 1969, the Workmen's Compensation Appeal Board affirmed the commissioner's ruling by a two to one vote. The view of the majority is expressed in an opinion accompanying and explaining the reasons for their order in this language:

> [T]he claimant, at the time of his death, was engaged in a strenuous undertaking to unfoul a heavy belt. This Board further takes cognizance of the evidence that the employee had been performing extra work as requested by his employer. Further, that the claimant, at the time of sustaining his heart attack, was helping in the unfouling of the belt all of which could have caused an extra strain on his heart.

> Under the circumstances, this Board is of the opinion that this was a fortuitous event; that it did result from his employment; that the coronary occlusion was suffered under unusual strains and exertions and it was as a result of the claimant's employment.

This Court granted an appeal from that decision and the case was submitted upon extensive briefing by counsel for the parties but without oral argument.

Code, 23-4-1, as amended, provides for the payment of compensation to employees or the dependents of deceased employees who "shall have received personal injuries in the course of and resulting from their employment" providing, of course, in the case of death benefits, that such injury caused the death of the employee. It can be seen from this section that three elements must coexist in compensation cases: (1) a personal injury (2) received in the course of employment *and* (3) resulting from that employment. The conjunctive "and" shows that the last two elements are not synonymous. That is the vital provision of the workmen's compensation law that is determinative of the issues arising in this case. The only exception is

the following language in 23-4-1: "For the purposes of this chapter the terms 'injury' and 'personal injury' shall be extended to include silicosis and any other occupational disease as hereinafter defined . . . ." As to these and other related matters, see De La Mater, "A Brief Survey of the West Virginia Law of Compensability," 62 W. Va. L. Rev. 303 (1960).

There is no contention in this case that whatever caused the decedent to leave his place of employment and go to a hospital did not occur in the course of his employment. The question in the instant case is whether the deceased suffered a personal injury resulting from his employment which caused his death. This is the first syllabus point of *Adams* v. *Murphy Company*, 115 W. Va. 122, 174 S. E. 794:

> A disability incurred by an employee in the course of his employment, not directly attributable to definite, isolated, fortuitous occurrence, is not compensable under the State Compensation Act.

In the opinion it is emphasized that the workmen's compensation fund was created and exists only for the payment of compensation for injuries and is not a health and accident fund. This is the third syllabus point from *Jones* v. *Rinehart*, 113 W. Va. 414, 168 S. E. 482, which also emphasizes that point:

> Disease contracted in the course of and resulting from employment is not compensable under the West Virginia Compensation Act, Code 1931, 23-4-1, unless directly attributable to a definite, isolated, fortuitous occurrence.

We now come to a discussion of evidence in such cases. This Court has held that the compensation law of this State, being remedial in nature, is to be construed liberally. The unique character of the compensation law, however, does not remove it from the province of this Court to apply, construe, or interpret *all* legislative acts. The liberality rule has been extended to the appraisal of evidence in a contested workmen's compensation case. As to the weight to be given findings of fact by the

appeal board based on the evidence, this Court is directed by Code 23-5-4a to give "like weight to that accorded to the findings of facts of a trial chancellor or judge in equity procedure." See *Whitt* v. *Compensation Commissioner,* 153 W. Va. 688, 172 S. E.2d 375, decided at this term of Court, for a discussion of these matters and a history of the development of the liberality rule.

A necessary corollary to the above-quoted portion of Code 23-5-4a is exactly what weight this Court must give to "the findings of facts of a trial chancellor or judge in equity procedure." R.C.P. 52 (a) provides:

> In all actions tried upon the facts without a jury or with an advisory jury, the court shall find the facts specially and state separately its conclusions of law thereon and direct the entry of the appropriate judgment. * * * *Findings of fact shall not be set aside unless clearly erroneous* . . . . (Emphasis added.)

The general rule is stated by Dr. Marlyn E. Lugar in his *West Virginia Rules Decisions* at page 58:

> Findings of a trial court upon facts submitted to it in lieu of a jury will be given the same weight as the verdict of a jury and will not be disturbed by an appellate court unless the evidence plainly and decidedly preponderates against such findings. * * *

Dr. Lugar then cites *Bluefield Supply Co.* v. *Frankel's Appliances, Inc.,* 149 W. Va. 622, 142 S. E.2d 989; *Work* v. *Rogerson,* 149 W. Va. 493, 142 S. E.2d 188; *Foglesong* v. *Foglesong Funeral Home, Inc.,* 149 W. Va. 454, 141 S. E.2d 390; *DeLong* v. *Farmers Building & Loan Ass'n.,* 148 W. Va. 625, 137 S. E.2d 11; *Dunning* v. *Barlow & Wisler, Inc.,* 148 W. Va. 206, 133 S. E.2d 784; and *General Electric Credit Corp.* v. *Fields,* 148 W. Va. 176, 133 S. E.2d 780. Thus, it can be seen by applying this well established principle to the language of Code 23-5-4a that this Court must give the same weight to findings of fact of the appeal board in compensation cases as it does to the findings of fact in a jury verdict, and such findings will not be set aside unless

clearly erroneous, or, as Dr. Lugar states, "the evidence plainly and decidedly preponderates against such findings." Of course, all of this presupposes that there was evidence in a case upon which a particular fact could be found to exist.

The terms "personal injuries," "in the course of" and "resulting from" employment as used in 23-4-1 have been liberally construed by this Court. In *Canoy* v. *Compensation Commissioner*, 113 W. Va. 914, 170 S. E. 184, a widow was awarded benefits upon a holding that the injury which caused her husband's death was within "the course of employment" although he was struck by an automobile on a public highway in walking from his home to his place of employment on the other side of the highway. There are many cases to the same effect, and if there has been an injury which was received in the "zone of employment" this Court has generally held that to be sufficient.

In *Turner* v. *Compensation Commissioner*, 147 W. Va. 106, 126 S. E.2d 40, it was held that an injury received by an employee in a fight with a fellow employee over the manner of the performance of their work "resulted from" employment. This Court held in *Gilbert* v. *Compensation Commissioner*, 121 W. Va. 10, 1 S. E.2d 167, that: "An acute dilatation of a normal heart, superinduced by an unusual lift or strain occurring in the course of and resulting from employment is a compensable injury within the meaning of Code, 23-4-1," even though at the time of the employee's heart attack he was performing duties which "consisted principally" of that which was his usual employment. The claimant was "unloading and handling" sacks of feed and grain weighing one hundred to one hundred twenty pounds each. While lifting one of those sacks he felt a severe chest pain in the region of his heart. "He immediately became short of breath . . . and was unable to continue work." On that day he was taken to a hospital and an examination revealed that he had suffered "an inch and one-half dilata-

tion" of one side of the heart. No heart lesions were found. To further quote from the opinion, "It was an acute dilatation." In finding that this was an injury within the meaning of the Act, the opinion is careful to point out that the claimant's disability "shown by the record to be the result of a definite, isolated, fortuitous occurrence, was a 'personal injury' within the meaning of the Act . . . ." The case was distinguished from *Martin* v. *Compensation Commissioner*, 107 W. Va. 583, 149 S. E. 824. In that case, a coal miner requested his son-in-law to assist him in pushing a loaded mine car a distance of forty feet so that he could repair the track in the room where he was working. The car and its contents weighed about two and one-half tons. According to the opinion, "They put their shoulders to the car and shoved it the desired distance. Just after shoving the car Martin complained of a hurting in his chest and sat down on some dust in the mine saying that he intended to smoke." About ten minutes later he died. The son-in-law testified that "it required much force and effort to move the car." The medical evidence was conflicting as to the cause of death, or more particularly as to what contribution the shoving of the car made to the death. Two physicians testified that death was caused by chronic endocarditis and that this condition had been of long standing "and that death might have occurred from that cause at any time; but that the exertion caused by pushing the car could not have caused the death without the existing organic disease; and that it is possible and probable that the exertion may have contributed to the death." Two physicians gave as their opinion, in answer to a hypothetical question, that the effort of moving the loaded car was the proximate cause of the death. Nevertheless this Court affirmed the previous order of the appeal board denying compensation benefits to deceased's dependents. It is evident from the language of the opinion that this Court concluded, even though death was due to disability occurring in the course of and resulting from the deceased's employment, it was not a compen-

sable fatality because there was no personal injury as provided by statute and defined by this Court. The Court said: "In the case under consideration there were no external or internal marks or evidence of injury. Moreover, it is shown that it was not unusual for coal loaders to shove the loaded cars out of their way, although they were not required to do so. It was the ordinary and not unusual labor which he was performing. And under the evidence we cannot disturb the finding of the Commissioner approved by the Appeal Board, that there was no unusual nor extraordinary effort made by the employee in moving the car."

In *Pannell* v. *Comp. Com'r.*, 126 W. Va. 725, 30 S. E.2d 129, this Court reversed the appeal board and held compensable a fatality which occurred under these circumstances: Pannell was a coal miner and made a "breakthrough" from his working place into an abandoned part of the mine from which air immediately came into the vicinity of Pannell. Shortly thereafter he was overcome from some cause and died. Referring to the commissioner and the appeal board, this statement is contained in the opinion: "In our opinion, they should have held the decedent's death compensable, and their holding should have been based upon the isolated, specific and fortuitous event of the break-through, and the release of gas . . . ." Several former decisions of this Court are cited for that statement.

In considering this case, this Court has, of course, not overlooked *Pripich* v. *Compensation Commissioner*, 112 W. Va. 540, 166 S. E. 4, and *Vankirk* v. *Compensation Commissioner*, 144 W. Va. 447, 108 S. E.2d 567. The only syllabus point of the *Vankirk* case is the quotation of the first syllabus point of the *Pripich* case and is as follows:

> Where, in the course of and arising out of his employment, an employee in good health and of strong physique, suffers physical injury which is followed by serious disabilities, competent physicians differing as to whether the disabilities are attributable to the injury, but only probable or conjectural reasons or causes are assigned by

> physicians in an effort to explain the disabilities on grounds other than the injury, the presumptions should be resolved in favor of the employee rather than against him.

In each of those cases the workman had received an injury in the course of and resulting from his employment. The questions arose out of whether disability thereafter resulted therefrom. In the instant case, even if it could be conceded that the disability of the deceased was incurred in the course of and resulting from his employment, the crucial question is whether he received a "personal injury" as provided by statute and as that term has been defined in previous decisions of this Court. See *Keller* v. *Compensation Commissioner,* 125 W. Va. 185, 24 S. E.2d 81; *Gilbert* v. *Compensation Commissioner,* 121 W. Va. 10, 1 S. E.2d 167; *Rasmus* v. *Compensation Appeal Board,* 117 W. Va. 55, 184 S. E. 250; and *Collett* v. *Compensation Commissioner,* 116 W. Va. 213, 179 S. E. 657.

At the first hearing, the claimant widow testified that her husband was forty-two years of age, worked regularly, had missed no work as a result of illness; that he worked from twelve to sixteen hours a day and that he had no history of previous heart ailment. Two of the deceased's three-man crew, Williams and Crites, testified at the first hearing. The third member, Curry, testified at a subsequent hearing, stating that he had not been subpoenaed at the first one. It is clear from the testimony of the lay witnesses other than the claimant widow, all of whom were appellees' witnesses, that deceased and his three-man crew were not "dragging a four-ton belt" because it was too heavy to lift nor were they "tugging and dragging" a one-thousand pound belt, because it was too heavy to lift. The crew was moving a belt which the witnesses estimated weighed about a thousand pounds. The belt was about four hundred feet long and it was to be moved by placing one end of it upon another belt, starting the machinery that moved that belt, and thereby taking the belt that was being loaded to the new section where it was to be installed. The crew did lift one end

of the belt upon the belt that would transport it, and the testimony is silent as to whether the deceased participated in that act or, if so, how much that part of the belt which was lifted onto the other belt weighed. The end of the belt to be moved was placed into position, and the machinery was started which would transport it, whereupon a portion of the transported belt became "fouled" in the gears or machinery of the belt that was moving it, and it is the efforts of the deceased in unloosening the belt from the machinery that allegedly constituted the personal injury which caused his heart attack and subsequent death. The board, as heretofore noted, found that this act did constitute an isolated, fortuitous event as the term personal injury has been defined by this Court.

Williams testified that it took at least twenty-five minutes to free the belt. He was asked that if during that time Barnett was "tugging and pulling on this belt," and his answer was, "Yes, sir, he was helping us." He was then asked: "[H]ow long after this tugging and pulling on this belt took place" did Barnett become ill and complain of chest pains. His answer was: "Well, I'd say it would be 30 minutes approximately . . . ." These questions were asked and these were made with regard to whether it was usual or unusual for the crew to be faced with a fouled belt and be required to unfoul it:

Q. But it was a fairly common thing?
A. It was.

Q. And it happened quite a bit?
A. Yes, sir.

Q. And it was fairly common for Mr. Barnett to help you with it?
A. Yes, sir, it was.

Crites testified subsequently, as had Williams, as to the fouling of the belt and the efforts of the crew, including the foreman, in untangling it. He estimated that it took twenty-five to thirty minutes to do so. He was then asked how long it was after the belt had been freed until Mr.

Barnett became ill. He answered, "Well, I'd say 10 or 15 minutes, not too long." In reference to the belt, he was further asked these questions and made these answers:

Q. And you weren't actually trying to lift it, were you?

A. No, we was just trying to free it.

Q. Were you pulling it with wire pliers?

A. Yes, sir.

Q. And that's just a regular pair of hand wire pliers like you would buy at the five and ten?

A. Yes, sir.

Q. Would you just take hold of it with a pair of pliers and jerk on it?

A. Yes, sir.

Q. You would try to free it loose with that?

A. Yes, sir.

Q. Now, you say he had helped you do this very job a lot of times before?

A. Yes, sir.

This witness further testified that he had known the deceased for eighteen years; had worked with him for a number of years and had never heard him complain of any chest pains. He stated that during the four to six months prior to his attack the deceased had worked "steady."

The third member of the crew, Victor Curry, testified at a hearing on November 12, 1968, the first hearing having been held on August 5 of that year, and admitted that he had, prior to the hearing at which he testified, "discussed" at some length the testimony of the other members of the crew who had testified earlier. He stated that it required about one-half to three-fourths of an hour to unloosen the belt and that deceased "commenced complaining before we got this rubber unfouled." He was asked these questions and made these answers:

Q. Was it while he was pulling and tugging on the belt?

A. It was.

Q. Did he continue to work after that?

A. Just till we got the rubber released.

Q. But did he continue to work after complaining about the pains in his chest?

A. No, he didn't.

Q. How long did he stay there with you after he started complaining that he was ill?

A. Well, something about an hour.

Upon cross-examination, he was asked these questions and made these answers:

Q. Mr. Williams testified it was thirty minutes after he had been working on this belt that he became ill. Is that your recollection?

A. Thirty minutes after it was fouled up.

Q. After you'd been tugging on the belt that he got sick?

A. It was something like that or while we were pulling on it.

These further questions were asked of this witness and he made the following replies:

Q. So all it was, you just fed the end of the belt on another belt and it ran into another working place?

A. That's right.

\* \* \*

Q. And he did this ordinarily and regularly?

A. That's right.

\* \* \*

Q. And he [Barnett] had helped you on numerous occasions before this?

A. He had.

Q. Doing exactly the same type of thing he was doing there on that night?

A. Well, yes.

The trial examiner asked this, "[H]ad anybody used their hands to pull it in addition to the pliers? The witness: Not that I know of." These further questions were asked of this witness and these answers made:

Q. Other rubber belts got fouled often, too, didn't they?

A. Quite often.

Q. And he [Barnett] used pliers to tug on it?

A. That's right.

\* \* \*

Q. He was just doing his regular job on that day?

A. That's right.

Q. Nothing out of the ordinary?

A. That's right.

The only medical witness who testified in this case was Dr. James Richard Glasscock of Richwood, West Virginia, who stated that he first saw Mr. Barnett as a patient after he was admitted to the Sacred Heart Hospital in Richwood "on the 10th about 8:15 a.m." The lay evidence showed that after the deceased became ill inside the mine, he was taken to the "head" on a belt and that he insisted on walking the remaining distance to the mine entrance which was about 500 or 600 feet. There is a hiatus in the testimony as to what occurred between the time he started walking out of the mine and was admitted to the hospital. To continue with Dr. Glasscock's testimony, he said when he first saw Barnett, "He was in quite a degree of shock and complained of rather intense internal chest pain which he claimed was radiating down his left arm." As heretofore stated, the witness diagnosed his patient's condition as coronary occlusion followed by a "myocarditis infarction" which the witness describes as "the death" of the area of the heart which the blocked or occluded artery had served. These are questions asked of and answers made by the medical witness:

Q. Doctor, would unusual exertion on the part of the patient result in a hemorrhage of a vein?

A. Well, it could result in a hemorrhage of the vein or the breaking of it, or these little plaques that form with the aging of the arteries could be displaced and cause a blockage.

Q. What are these plaques that you speak of?

A. They're principally cholesterol or a form of cholesterol plaques.

Q. Do I understand your testimony to be that unusual exertion might displace this plaque and cause a blockage of the vein?

A. Those little plaques will come on with age and tend to weaken the artery to create some blockage. At times they just break loose on their own after most any form of exertion.

At the August 5, 1968, hearing, this witness was asked a hypothetical question but, because an emergency arose, it was necessary for him to leave the hearing without answering the question. The trial examiner had sustained an objection to it, but for the purposes of the record he was to give his answer. At the May 21, 1969, hearing the hypothetical question was repeated. Another trial examiner overruled the objection to it and the witness answered. The witness was first asked if he took a history from Barnett and this was his answer:

A. From his wife, because he was not able to speak. He was in very bad condition.

Q. What was the history that you obtained from his wife?

A. That he complained to her of feeling rather poorly for the previous few days and had complained of considerable shortness of breath after exertion, and that she had tried to keep him from going to work that day but that he went ahead.

Then the hypothetical question asked at the former hearing was repeated and this is the question in its entirety:

Q. Now, in a prior hearing, just to refresh your recollection and I am going to read this question Mr. Barber says from Page 9 of the record of November 12, 1968 "All right, Doctor, if you will assume that Garcie Barnett had no prior medical history of a heart condition, that he had not experienced any chest pains nor any complaint prior to his attack while work-

ing, that until his attack he had worked regularly six days per week, approximately eight to 12 hours per day, *that he suffered an attack while helping to drag a conveyor belt because it was too heavy to be lifted by the work crew,* Doctor, assuming those facts as being correct, would this be sufficient exertion in your opinion within a reasonable degree of medical certainty to cause this attack?" (Emphasis added.)

\* \* \*

[Y]ou said, "I think it would be."

Upon cross-examination he was asked this question and made this answer:

Q. This type of condition can even happen when a person is home in bed, is that correct?

A. It has.

This Court is not familiar with the procedure in contested workmen's compensation claims with regard to whether the ruling of a trial examiner is final or whether the commissioner reviews the record, determines whether the question objected to should have been answered and then considers or refuses to consider such evidence. Neither do we know the procedure followed in that regard by members of the Workmen's Compensation Appeal Board. It is the view of this Court upon a careful examination of the testimony of the lay witnesses that the question was utterly unsupported by the evidence and for that reason the doctor should not have been allowed to answer the question or, having answered it, that his answer should not have been considered by the commissioner or the appeal board in arriving at a decision in this case. The witness was asked to assume that the deceased "suffered an attack while helping to drag a conveyor belt because it was too heavy to be lifted by the work crew." There was no evidence upon which to base that factual assumption. This is the first syllabus point of *Williams* v. *Compensation Commissioner,* 127 W. Va. 78, 31 S. E.2d 546, quoted from *Blair* v. *Clark Coal & Coke Co.,* 107 W. Va. 507, 148 S. E. 849: " 'A hypothetical ques-

tion which assumes facts unsupported by the evidence should not be submitted to an expert witness.' " The statutory provisions as to the informality of proceedings before the commissioner do not warrant such a departure from the ordinary rules of evidence. See *Hayes* v. *State Compensation Director*, 149 W. Va. 220, 140 S. E.2d 443.

In *Deverick* v. *Compensation Director*, 150 W. Va. 145, 144 S. E.2d 498, the claimant, a sheet metal worker, while lifting certain small angle irons to another employee who was on a scaffold, became "pale and appeared to be ill." He was taken to a hospital where his condition was diagnosed as "cerebral thrombosis while on job." The compensation commissioner awarded compensation and the appeal board affirmed that ruling. This Court unanimously reversed the board distinguishing the case from the *Pannell* case in this language: "There, in addition to the finding of a single fortuitous event which could have caused the disability, medical testimony established a causal connection between such disability and the workman's employment. In the instant case there is no medical evidence which even tends to establish such causal connection." This further statement appears in the opinion of that case: "No one, including the claimant, testified that the claimant did any work that was out of the ordinary or unusual for the average sheet metal worker. Even the testimony of the claimant did not reveal a single event which brought on his disability."

It is the view of this Court that the evidence of the appellees whether it be "by a preponderance of the evidence," "clear and convincing" or "satisfactory" is not sufficient under the authority of the decisions of this Court heretofore cited to establish the paramount fact that must be proved in every workmen's compensation case and that is that the deceased suffered a personal injury in the course of and resulting from his employment. There was no evidence of a "definite, isolated, fortuitous occurrence." It may be that his disability resulted from his employment and was received in the course of his employment but that is not enough and, if there is no injury,

the claimant's case must fail. All of our decisions hold that the burden of establishing that fact is upon the claimant for workmen's compensation. Even if we considered the answer of the medical witness to the hypothetical question propounded to him that would not make a case for the appellees. In *Eady* v. *Commissioner,* 148 W. Va. 5, 132 S. E.2d 642, is this statement:

This Court has consistently applied the liberality rule in the interpretation of evidence in workmen compensation cases; but it has also repeatedly held that though informality in the presentation of evidence is permitted in compensation cases and that the liberality rule will be invoked in appraising the evidence presented, nevertheless the burden of establishing a claim rests upon the person who asserts it and no rule of liberality will take the place of the requirement that the claim must be established by proof.

The question presented upon this appeal is a legal, not a medical question. In *Emmel* v. *Compensation Director,* 150 W. Va. 277, 145 S. E.2d 29, are these statements that are based upon many decisions of this Court:

Even the application of the liberality rule lends no assistance to the claimant, it having been well established that the use of such rule can not take the place of proper and satisfactory proof.

\* \* \*

It may be urged that the findings of the commissioner and workmen's compensation appeal board are conclusive and should not be disturbed by this Court. While the findings of fact of the appeal board are conclusive unless they are manifestly against the weight of the evidence, the legal conclusions of the appeal board, based upon such findings, are subject to review by the courts. Our review of this case concerns legal conclusions of the appeal board rather than findings of fact.

We have disregarded the statement of the appeal board to the effect that the coronary occlusion might have been caused by the deceased having worked overtime during a period prior to his attack. There is no evidence to

support such a conclusion and no authority for finding that such could be termed a definite, isolated, fortuitous event which, to repeat, is the definition this Court has given to the term personal injury.

The order of the Workmen's Compensation Appeal Board of November 21, 1969, is reversed. This decision will be certified to the Workmen's Compensation Commissioner and the Workmen's Compensation Appeal Board.

*Reversed.*