# IN THE INTERMEDIATE COURT OF APPEALS OF WEST VIRGINIA

2023 Spring Term

_____

No. 22-ICA-167

_____

FILED

**May 22, 2023**

released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
INTERMEDIATE COURT OF APPEALS
OF WEST VIRGINIA

WEST VIRGINIA HEATING & PLUMBING COMPANY,
Employer Below, Petitioner

v.

TYLER J. CARROLL,
Claimant Below, Respondent

_____

Appeal from Workers' Compensation Office of Judges

(JCN: 2021022612)

REVERSED AND REMANDED

_____

Submitted: February 28, 2023
Filed: May 22, 2023

Charity K. Lawrence, Esq.                Cynthia M. Ranson, Esq.
Spilman Thomas & Battle, PLLC            & J. Michael Ranson, Esq.
Charleston, WV                           Ranson Law Offices, PLLC
Counsel for Petitioner                   Charleston, WV
                                         Counsel for Respondent

JUDGE SCARR delivered the Opinion of the Court.

SCARR, Judge:

West Virginia Heating and Plumbing Company ("WVHP"), appeals the decision of the Workers' Compensation Office of Judges ("OOJ") dated September 12, 2022, which reversed the claim administrator's order dated June 9, 2021, rejecting Tyler J. Carroll's application for benefits. The OOJ decision held Mr. Carroll's claim compensable, stating that his injuries were sustained in the course of and as a result of his employment. WVHP contends that the OOJ's decision was clearly wrong because the evidence shows Mr. Carroll's injury did not occur as a result of his employment. Specifically, WVHP argues that Mr. Carroll was not injured as a result of his employment because prior to his injury, he left and deviated from his duties of employment when he exited the company van and crossed I-79 to render aid to a driver of a truck that had just crashed. WVHP argues that Mr. Carroll was injured as a result of this deviation from his employment, and therefore, Mr. Carroll was not injured as a result of his employment.

For the reasons stated below, we reverse the OOJ order dated September 12, 2022, and remand the issue of compensability to the Board of Review for a proper analysis under the applicable law in accordance with this opinion. In conducting the required analysis under the existing law, it is in the Board of Review's discretion whether or not it will accept additional evidence on these issues.

1

## I.  Facts and Procedural Background

This case involves claimant, Tyler J. Carroll, a third-year union apprentice in the Plumbers and Pipefitters Local Union #625.[1] At all times relevant, the employer, WVHP, was a member of the Kanawha Plumbing-Heating-Cooling-Contractors Association and therefore was bound by an agreement between that association and Mr. Carroll's union. At some point prior to the subject accident on May 4, 2021, Mr. Carroll along with Leonard Ernie Bragg, a union journeyman, were assigned by Mary Beth Johnson, president, and owner of WVHP, to work on a project over two-days at the federal courthouse in Pittsburgh, Pennsylvania.

On May 3, 2021, Mr. Carroll and Mr. Bragg departed Charleston, West Virginia for Pittsburgh, Pennsylvania, in a WVHP van loaded with company tools, equipment and materials for the project. The union agreement specifically required the transporting of company tools and equipment in a vehicle owned or leased by the company. WVHP paid for overnight accommodations in Pittsburgh for the two men, and the purchase of fuel and meals while they traveled. Mr. Carroll and Mr. Bragg performed work in Pittsburgh on May 3, and May 4, 2021.

At about 5:30 p.m. on May 4, they finished their work on the project and loaded the WVHP van with the remaining materials and equipment. At about 6:30 p.m.,

---

[1] Mr. Carroll was twenty-three years old at the time of the accident.

they departed Pittsburgh and headed south on I-79 toward Charleston. After the two stopped in Morgantown for fuel and dinner, they continued their journey south on I-79 to Charleston.

At around 9:05 p.m., near the Sutton exit, they witnessed a white pick-up truck heading northbound on I-79 lose control, cross the median, and barrel roll into the southbound lanes of I-79. Mr. Carroll, driving the van, took evasive action and swerved to miss the oncoming pickup truck, and thereby successfully avoided the collision.[2] Mr. Carroll steered the van onto the right shoulder of the southbound lane when he and Mr. Bragg noticed disabling damage to the truck. Photographs show the truck came to rest primarily in the left southbound lane, but a significant portion of the truck had crossed into the right lane. Mr. Carroll turned on his hazard lights, observed that no traffic was approaching from behind, and backed up the van along the shoulder a short distance to get closer to the truck.

Thereafter, Mr. Carroll and Mr. Bragg exited the van to render aid. Mr. Carroll rushed to the driver's door of the truck, while Mr. Bragg went to the rear of the van with his cell phone flashlight engaged attempting to stop and warn any oncoming

---

[2] WVHP disputes that Mr. Carroll took evasive action because it was not referenced in the uniform traffic crash report. However, the OOJ concluded in the findings of fact that the preponderance of the evidence establishes that he did take evasive action, relying on the affidavit by Mr. Carroll, the initial affidavit of Mr. Bragg, and the photograph of the truck's final resting spot.

3

southbound traffic. As Mr. Carroll approached the truck, he could see the driver through the windshield, the driver's head was slumped forward, and he appeared to be unconscious. Mr. Carroll tried to communicate with the driver but there was no response. Mr. Carroll attempted to open the driver's door, but it was jammed shut.

In the meantime, a tractor-trailer approached the crash site, but, due to Mr. Bragg's flashlight warning, the truck was able to stop in the slow lane without hitting the disabled truck. Seconds later, another truck appeared and slowed behind the tractor-trailer. Then a small black vehicle, identified in the crash report as an uninsured 2013 Chevrolet Cruise, traveling at a high rate of speed, passed the truck and the tractor-trailer in the passing lane and struck the disabled white pick-up truck near the driver's side door where Mr. Carroll had been working to free the driver.

After the impact, Mr. Bragg looked at where Mr. Carroll had been standing, but he was no longer there. Mr. Bragg observed the white pick-up truck "spinning and sliding further south on the interstate." Mr. Carroll later stated that the last memory he had was the light of Mr. Bragg's flashlight and the sound of a tractor-trailer gearing down. Mr. Bragg, along with another person who stopped at the crash scene to provide assistance, referred to as a "nurse" by Mr. Bragg, found Mr. Carroll lying in the median. Mr. Carroll was treated on the scene by EMS personnel and transported by helicopter to Charleston Area Medical Center.

Mr. Carroll sustained multiple fractures involving all four extremities and his skull. On May 11, 2021, Mr. Carroll underwent a below-the-knee amputation of his left leg. However, ultimately it was determined that there was insufficient tissue to salvage the leg below the knee, and he underwent another amputation above the knee on May 14, 2021.

By order dated June 9, 2021, the claim administrator denied Mr. Carroll's application for workers' compensation benefits, stating that his injuries were not sustained in the course of and as a result of his employment. The OOJ issued an initial order dated December 22, 2021, which reversed the claim administrator's order. After entry of the order, the OOJ notified the Board of Review that as a result of a computer error, two documents, a second affidavit by Mr. Bragg dated November 8, 2021, and the employer's closing argument dated November 10, 2021, were not considered by the OOJ. WVHP's counsel requested a remand and Mr. Carroll's counsel objected. On April 19, 2022, the Board of Review found the two documents to be necessary and remanded the claim to the OOJ. On September 12, 2022, the OOJ, after consideration of the additional evidence, again ordered the claim administrator's order be reversed and the claim be held compensable. It is from this September 12, 2022, order that WVHP now appeals.

## II. Standard of Review

Our standard of review is set forth in West Virginia Code § 23-5-12a(b) (2022), in part, as follows:

The Intermediate Court of Appeals may affirm the order or decision of the Workers' Compensation Board of Review or remand the case for further proceedings. It shall reverse or vacate, or modify the order or decision of the Workers' Compensation Board of Review, if the substantial rights of the petitioner or petitioners have been prejudiced because the Board of Review's findings are:

(1)     in violation of statutory provisions;
(2)     in excess of the statutory authority or jurisdiction of the Board of Review;
(3)     made upon unlawful procedures;
(4)     affected by other error of law;
(5)     clearly wrong in view of the reliable, probative and substantial evidence on the whole record; or
(6)     arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

*Duff v. Kanawha Cnty. Comm'n*, 247 W. Va. 550, 882 S.E.2d 916, 921 (Ct. App. 2022).

Questions of law arising in decisions issued by the Board are reviewed *de novo*. *Justice v. W. Va. Off. Ins. Comm'n*, 230 W. Va. 80, 83, 736 S.E.2d 80, 83 (2012). Although this statute specifically references orders of the Board of Review, this Court concludes that the same standard should apply to our review of orders issued by the OOJ during the period of time when administrative proceedings were being transferred from the OOJ to the Board of Review. *See* W. Va. Code § 23-5-8a (2022) (transferring powers and duties of OOJ to the Board of Review); W. Va. Code § 23-5-12b (2021) (specifying this same standard of review when the Board of Review heard appeals of OOJ's orders).

## III.    Discussion

**A.** *Application of the "Going and Coming Rule"*

WVHP argues several assignments of error.[3] First, WVHP argues that the OOJ committed an error of law by finding that Mr. Carroll is not precluded from compensation by the "going and coming rule." Specifically, WVHP argues that although Mr. Carroll was injured while working for WVHP, the preponderance of the evidence shows that he was not within the zone of his employment because Mr. Carroll deviated from his duties of driving the company vehicle home when he left the vehicle and walked across I-79 to render assistance to the driver of a truck that had just been involved in an accident.

In response, Mr. Carroll argues that the "going and coming rule" applies only where the evidence linking the employer to the accident is the fact that the employee was coming or going to work. Where additional evidence exists linking the employer to the accident, such as when the use of the roadway is required in the performance of the employee's duties or the employer, when the employee is rendering an express or implied service to the employer, or when there is an incidental benefit to the employer that is not

---

[3] We have reordered WVHP's assignments of error to accord with our analysis. *See, e.g.*, *Harlow v. E. Elec., LLC*, 245 W. Va. 188, 195 n.25, 858 S.E.2d 445, 452 n.25 (2021).

common to ordinary commuting trips, the application of the "going and coming rule" may be altered. *See Courtless v. Joliffe*, 203 W. Va. 258, 507 S.E.2d 136 (1998).

The "going and coming rule" is well established in West Virginia, and is set forth as follows:

> An injury incurred by a workman, in the course of his travel to his place of work and not on the premises of the employer, does not give right to participation in such [Workers' Compensation] fund, unless the place of injury was brought within the scope of his employment by an express or implied requirement in the contract of employment, of its use by the servant in going to and returning from his work.

Syl. Pt. 2, *Williby v. W. Va. Off. Ins. Comm'r*, 224 W. Va. 358, 686 S.E.2d 9 (2009) (holding that a claimant's injury did not occur in the course of or as a result of her employment when she was injured while traveling across the street to get lunch). "When an employee engages in a major deviation from the business purpose of travel, worker's compensation for injuries suffered while traveling can be denied." Syl. Pt. 3, *Calloway v. State Workmen's Comp. Comm'r*, 165 W. Va. 432, 268 S.E.2d 132 (1980). As the Supreme Court of Appeals recognized in *Brown v. City of Wheeling*, 212 W. Va. 121, 126, 569 S.E.2d 197, 202 (2002),

> [u]nder normal circumstances, an employee's use of a public highway going to or coming from work is not considered to be in the course of employment. The reasoning underlying this rule is that the employee is being exposed to a risk incidental to that of the general public; the risk is not imposed by the employer.

8

The OOJ concluded that Mr. Carroll experienced an isolated fortuitous occurrence in the course of his employment, and therefore his claim was not precluded by the "going and coming rule." The OOJ found that in order to facilitate its business as an HVAC and plumbing contractor, it was necessary for WVHP to provide its employees with a means of transportation for both themselves and necessary tools and equipment. In this regard, the OOJ found that the journey was part of the job. Additionally, the OOJ found that the provisions of Mr. Carroll's transportation provided significant incidental benefits to WVHP that are not common to ordinary public commuting trips. Significantly, Ms. Johnson testified that WVHP received benefits from its employees transporting tools, equipment, and materials, and the employees themselves to Pittsburgh in the company van. Further, WVHP derived additional benefits from the employees, tools, equipment, and materials being transported back to Charleston. Thus, the OOJ concluded that in light of the significant incidental benefits to the employer, which are not common to ordinary commuting trips, the preponderance of the evidence demonstrated that Mr. Carroll was acting within the course of his employment at the time of the accident on May 4, 2021.

This Court notes that initially it was disputed whether Mr. Carroll was still in the course of his employment while traveling back from Pittsburgh to Charleston. However, sometime after commencement of the litigation before the OOJ, WVHP conceded that under the Fair Labor Standards Act, Mr. Carroll was owed compensation for

9

his travel time on his return trip from Pittsburgh.[4] Because the issue of the "going and coming rule" is not dispositive of the ultimate issue in this case, this Court does not find it necessary to further address it.

## B. *Applicability of Erin's Law*

Next, we turn to WVHP's second assignment of error, asserting that the OOJ incorrectly interpreted the requirements of West Virginia Code §§ 17C-4-1(a) (2018) and 17C-4-3(b) (2015). Specifically, WVHP argues that the OOJ was clearly wrong in finding that Mr. Carroll was legally obligated to stop and render aid pursuant to West Virginia Code §§ 17C-4-1(a) and 17C-4-3(b). This statute, known as Erin's Law, requires individuals who are "involved in a crash" to stay at the scene, provide information, and render "reasonable assistance" to an injured person "if physically able to do so." §§ 17C-4-1(a), 17C-4-3(b). WVHP argues that the preponderance of the evidence shows Mr. Carroll was not "involved in" a crash or collision and the statutory duty did not apply to Mr. Carroll's rescue attempt. West Virginia Code § 17C-4-1(a), provides:

> The driver of any vehicle involved in a crash resulting in the injury to or death of any person shall immediately stop the vehicle at the scene of the crash or as close to the scene as possible and return to and remain at the scene of the crash until he or she has complied with the requirements of § 17C-4-3 of this code . . . .

---

[4] Mr. Carroll argues that as a result of this concession, this appeal is now moot. However, that is not the case, as it still needs to be determined whether his injuries occurred as a result of his employment with WVHP.

Additionally, West Virginia Code § 17E-4-3(b) (2015), provides:

> The driver of any vehicle involved in a crash resulting in injury to or death of any person, if physically able to do so, shall render to any person injured in such crash reasonable assistance, including the carrying, or the making arrangements for the carrying, of such person to a physician, surgeon or hospital for medical treatment if it is apparent that such treatment is necessary or if such carrying is requested by the injured person.

In discussing these statutes, the Supreme Court of Appeals has held, "it is not a requirement that a defendant's vehicle make direct physical contact with the other vehicle or person whose death was proximately caused by the crash." Syl. Pt. 7, *State v. McClain*, 247 W. Va. 423, 880 S.E.2d 889 (2022). The collision in *McClain* resulted from a defendant's tractor-trailer clipping an oncoming tractor-trailer on a narrow road, causing the oncoming truck to collide with another motorist. *See McClain*, 247 W. Va. at ___, 880 S.E.2d at 892. Answering a certified question regarding the meaning of the language "involved in a crash," the *McClain* Court concluded that a statutory duty to stop and render aid applies to motorists who proximately cause injury or death to another, regardless of direct physical contact. *See McClain*, 247 W. Va. at ___, 880 S.E.2d at 898.

The OOJ concluded Mr. Carroll's need to take evasive action to avoid the out-of-control truck made him "involved in a crash." As a result, this triggered a statutory duty to remain at the scene and render aid, placing Mr. Carroll's rescue within the scope of employment. We disagree. While direct physical contact is not required to be "involved in a crash," in the case *sub judice*, Mr. Carroll was not involved in the accident since he was

11

able to effectively avoid involvement in the accident and there is no evidence that he caused the accident. Thus, we conclude the OOJ erred in finding that Erin's Law triggered a statutory duty requiring Mr. Carroll to undertake a rescue.

## C. *Applicability of the Good Samaritan and Positional Risk Doctrines*

Lastly, we turn to WVHP's final assignment of error, which presents two separate arguments, disputing the OOJ's application of the Good Samaritan and positional risk doctrines as alternative means to find that Mr. Carroll was injured in the course of and resulting from his employment. WVHP argues that the OOJ incorrectly analyzed this claim under the Good Samaritan, rescue, and positional risk doctrines, none of which have been recognized by West Virginia courts in the context of workers' compensation jurisprudence.

The Supreme Court of Appeals has consistently held that "[i]n order for a claim to be held compensable under the Workmen's Compensation Act, three elements must coexist: (1) a personal injury (2) received in the course of employment and (3) resulting from that employment. Syl. Pt. 1, *Barnett v. Workmen's Comp. Comm'r*, 153 W. Va. 796, 172 S.E.2d 698 (1970). The two phrases "in the course of" and "resulting from" "are not synonymous and both elements must concur in order to make a claim compensable." *Emmel v. State Comp. Dir.*, 150 W. Va. 277, 281, 145 S.E.2d 29, 32 (1965). "The task of construction is made easier by breaking the phrase in half, with the arising out of [or resulting from] portion construed to refer to the causal origin, and the course of employment portion to the time, place, and circumstances of the accident in relation to the

12

employment." *Morton v. W. Va. Off. of Ins. Comm'r*, 231 W. Va. 719, 723, 749 S.E.2d 612, 616 (2013) (citation omitted). Regarding the requirement that an injury "result from" employment, the Supreme Court of Appeals has held: "in determining whether an injury resulted from claimant's employment a causal connection between the injury and employment must be shown to have existed." *Id.* (citation omitted).

Applying the Good Samaritan, rescue, and the positional risk doctrine in the workers' compensation context is a matter of first impression in West Virginia.[5] Each legal

---

[5] In *Morton*, a passing reference to these doctrines was made in dicta. *Morton*, 231 W. Va. at 725 n.6, 749 S.E.2d at 618 n.6. There, the Supreme Court of Appeals considered if an employee's injury sustained while assisting a coworker carry a box of maternity clothes "resulted from" her employment. *Id.*, at 722, 749 S.E.2d at 615. While not argued, the Court considered the applicability of these doctrines, though only referencing the Good Samaritan doctrine by name:

> Although not argued by the parties, we note that we do not find this case amenable to analysis under the "Good Samaritan doctrine" recognized by some courts in assessing compensability of injuries sustained while rendering aid to others. In cases where this doctrine has been applied to find compensability, typically the aid rendered is of an emergent nature and the employee's "conditions of employment" positioned him or her to undertake the rescue. *See Olde South Custom Landscaping, Inc. v. Mathis*, 229 Ga. App. 316, 494 S.E.2d 14 (1997); *see also Rockhaulers, Inc. v. Davis*, 554 So.2d 654 (Fla. Dist. Ct. App. 1989). Even in jurisdictions applying this doctrine, courts frequently also require the act to "at least partially benefit his employer in order for an injury to be considered incidental to or arising out of employment." *Quinney v. Md. Cas. Co.*, 347 So.2d 921, 923 (La. Ct. App. 1977); *Roberts v. Burlington Ind., Inc.*, 321 N.C. 350, 364 S.E.2d 417, 421 (1988) ("An injury to an employee while he is performing acts for the benefit of third persons does not arise

13

doctrine is understood as a separate concept in Larson's treatise on workers' compensation. *See* 3 Arthur Larson & Lex K. Larson, *Larson's Workers' Compensation Law* § 27.02[2][a], § 28.01[1] (2022). Larson discusses the Good Samaritan doctrine in the context of employees performing small favors and generating goodwill among the public; however, the act must still confer a benefit of some kind to the employer.[6] *Id.* § 27.02[2][a].

### i.  *Good Samaritan Doctrine*

Applying the Good Samaritan doctrine, the OOJ found that Mr. Carroll was injured in the course of and resulting from his employment. To reach his conclusion, the OOJ determined that WVHP had been conferred a benefit by Mr. Carroll's rescue. Specifically, it concluded that because Mr. Carroll was "involved in a crash," under Erin's Law, a statutory duty to stop and render aid was triggered. As a result, Mr. Carroll benefited his employer by taking appropriate action under West Virginia law. We disagree. Our earlier determination controls here; because the OOJ's application of Erin's Law was error, the OOJ's conclusion on this point is also error. Elsewhere in the decision, the OOJ also reasoned that Mr. Carroll was acting in the benefit of WVHP in returning the company

---

out of the employment unless the acts benefit the employer to an appreciable extent.").

*Morton*, 231 W. Va. at 725 n.6, 749 S.E.2d at 618 n.6.

[6] *See Larson* at § 27.02[a] (providing a list of examples, such as "an employee whose official duties had something to do with-wrapping chicken-heads was hurt while courteously helping a patron back into a parking area," a bar employee driving a drunk patron home, or an aviation mechanic helping a student start his car).

van, which contained personnel, tools, equipment, and materials to Charleston. However, we find that the benefit has no connection with departing the work vehicle to render aid on a public road, and therefore the OOJ erred in concluding that Mr. Carroll was injured in the course of and resulting from his employment.

### ii.   *Positional Risk Doctrine*

In comparison to the Good Samaritan doctrine, Larson delineates the traditional rescue/emergency doctrine as applying to situations where an employee, in response to an emergency, is attempting to preserve something that the employer has an interest in: property, coworkers, reduction of liability, the employees themselves, etc. *See Larson*, *supra*, § 28.01[1] ("It is too obvious for discussion that emergency efforts to save the employer's property from fire, theft, runaway horses, destruction by strikers, or other hazards are within the course of employment."); *see also Larson*, *supra*, § 28.01[2] (discussing the emergency doctrine, "whatever [the source of the emergency] the employee at that instant has the option of undertaking a rescue that is in his employer's interest or not undertaking it. If he undertakes it, he has embarked upon a service that is impliedly authorized by the employer."). Like the Good Samaritan doctrine, the traditional rescue doctrine generally requires the employee's act to confer a benefit to the employer. *See Larson*, *supra*, § 28; *see also Morton*, 231 W. Va. at 725 n.6, 749 S.E.2d at 618 n.6.

The positional risk doctrine, however, which is an extension of the traditional rescue doctrine, does not require that an employee's act confer a benefit to the employer.

15

*See Larson, supra,* § 28.02[3]. Larson explains the positional risk doctrine applies to "[i]njur[ies] incurred in the rescue of a stranger is compensable if the conditions of employment place the claimant in a position that requires the employee by *ordinary standards of humanity to undertake the rescue.*" *Larson*, *supra*, § 28 (emphasis added). Larson notes that not all rescues are compensable; however, the textbook case for application of the positional risk doctrine arises where an employee's duties require driving a vehicle and he encounters a roadway emergency:

> The rule here stated does not go so far as to say that every rescue of a stranger by an employee is covered; it refers to a rescue the necessity for making which is thrown in the claimant's path by conditions of his employment. When the claimant is a flagman at a dangerous crossing, or a worker in an area where construction and excavation are in progress, or a truck driver who is certain to encounter collisions along the highway it is easy to see the connection between the work and the contact with the emergency.

*Larson*, *supra*, § 28.02[1].

The OOJ decided that the Good Samaritan doctrine may have some applicability in the instant case, but ultimately concluded that this case is more accurately considered under positional risk concepts of the rescue doctrine. In doing so, the OOJ concluded that Mr. Carroll and Mr. Bragg were confronted with a true emergency. Mr. Carroll had to take evasive action to avoid the truck crossing the median and barrel rolling onto southbound 1-79. Mr. Carroll and Mr. Bragg were the only persons at the scene and were the only persons who could initiate aid to the truck driver and attempt to prevent further harm. Here, the requirements and performance of Mr. Carroll's employment thrust

16

him into contact with an emergency situation. Moreover, Mr. Carroll's employment brought him to a place where it was probable that he and Mr. Bragg would have a natural reaction as human beings to take action to facilitate aid to the injured truck driver. As to the reasonableness of Mr. Carroll's actions, it is significant to note that Mr. Bragg was Mr. Carroll's superior and supervisor. Further, Mr. Bragg's participation in the rescue attempt also speaks to the propriety of the natural human response that it appears they shared.

However, in the absence of any West Virginia legislation or controlling authority by the Supreme Court of Appeals providing for the adoption of the positional risk doctrine, generally or at least in a workers' compensation setting, we find that the OOJ erred in applying it in this case. The OOJ is an administrative body, which possesses only the jurisdiction, power, and authority granted to it by the legislature. *See* Syl. Pt. 4, in part, *State ex rel. Beirne v. Smith*, 214 W. Va. 771, 591 S.E.2d 329 (2003) ("[t]he ultimate responsibility for the fiscal health of the West Virginia Workers' Compensation system rests with the legislature ....") (citation omitted); *see also Olde South Custom Landscaping, Inc. v. Mathis*, 229 Ga. App. 316, 319, 494 S.E.2d 14, 17 (1997). "The primary object in construing a statute is to ascertain and give effect to the intent of the Legislature." Syl. Pt. 1, *Smith v. State Workmen's Comp. Comm'r*, 159 W. Va. 108, 219 S.E.2d 361 (1975). Although Mr. Carroll's acts are clearly a laudable, selfless response, this Court is not prepared on its own to adopt the positional risk doctrine in workers' compensation law. Based on the applicable law before the OOJ, it was error to apply a doctrine not yet recognized in West Virginia's workers' compensation jurisprudence.

17

## IV. Conclusion

While this Court praises Mr. Carroll for his actions on May 4, 2021, the Worker's Compensation Act, as currently written, does not provide for the adoption of the positional risk doctrine. This Court is compelled to leave it to the Legislature or the Supreme Court of Appeals to recognize such legal theories. Absent such legislation, or a holding by the Supreme Court of Appeals, Mr. Carroll's injuries are not compensable as they did not occur as a result of his employment under these doctrines. Mr. Carroll temporarily stepped outside his employment when he exited the company van on the interstate to render aid to a driver injured in an accident in which he was not involved. What remains is the question of why Mr. Carroll did so—whether any company policies or procedures caused him to do so, or whether he reacted to the statements and/or actions of his supervisor Mr. Bragg, which amount to express or implied authorization to engage in such conduct.

This Court reverses and remands to the Board of Review the OOJ order dated September 12, 2022, for a proper analysis under the applicable law in accordance with this opinion. Upon remand, the Board of Review should consider whether there were any company policies or procedures which provide guidance to employees as to the proper conduct when confronted with an accident or other emergency while traveling for work. Additionally, the Board of Review should consider whether the statements and/or conduct of any supervisor or company agent, including but not limited to Mr. Bragg, via statements

18

and/or actions, constitute actual or implicit authorization for Mr. Carroll to attempt to render aid. Further, if such authorization occurred, then the Board of Review should consider whether such authorization and/or conduct is enough to support a finding of compensability under the existing workers' compensation framework. In conducting the required analysis under the existing law, it is in the Board of Review's discretion whether or not it will accept additional evidence on these issues.


For the aforementioned reasons, this Court reverses the OOJ order dated September 12, 2022, and reverses and remands the issue of compensability to the Board of Review with the instructions listed above.


Reversed and Remanded.